COMMISSIONER OF INTERNAL REVENUE *v.*
HANSEN ET UX.

No. 380.   Argued April 29–30, 1959.—Decided June 22, 1959.*

---

*Together with No. 381, *Commissioner of Internal Revenue* v.
.*Glover,* on certiorari to the United States Court of Appeals for the
Eighth Circuit, argued April 29–30, 1959; and No. 512, *Baird et ux.*
v. *Commissioner of Internal Revenue,* on certiorari to the United
States Court of Appeals for the Seventh Circuit, argued April 30,
1959.

*Meyer Rothwacks* argued the causes for the Commissioner of Internal Revenue. With him on the brief for the Commissioner were *Solicitor General Rankin, Assistant Attorney General Rice* and *Joseph F. Goetten.*

*Lester M. Ponder* argued the cause for petitioners in No. 512. With him on the brief were *W. Byron Sorrell, John C. Williamson, Cullen B. Jones, Jr.* and *Thomas M. Scanlon.*

*Emmett E. McInnis, Jr.* argued the cause and filed a brief for respondents in No. 380.

*William S. Miller, Jr.* argued the cause for respondent in No. 381. With him on the brief were *E. Chas. Eichenbaum* and *Leonard L. Scott.*

Briefs of *amici curiae* in support of the taxpayers were filed by *James C. Moore* and *L. W. Anderson* for the National Automobile Dealers Association, and by *William Waller* for Vance L. Wiley et al.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

These federal income tax cases present questions concerning the proper and timely accrual of gross income deriving from sales of commercial installment paper by retail dealers to finance companies. The taxpayers involved in these cases are two retail automobile dealers and a house trailer dealer. All keep their books on the accrual

basis. Most of their sales are "credit sales." It appears that they generally negotiate, consummate, and finance such sales in accordance with a common pattern. The dealer and his customer agree upon a "Cash Delivered Price" for a particular vehicle owned by the dealer. In part payment of that price the customer makes a down payment to the dealer in cash or "trade in," or both. To the remaining balance of that cash price there is added the cost of insurance on the vehicle and a "finance charge." The aggregate is sometimes called the "Deferred Balance." It is evidenced and secured by an assignable or negotiable instrument retaining defeasible title to or a lien on the vehicle—generally on a form supplied by the finance company with which the dealer may then be doing business—and the instrument is signed by the customer, delivered to the dealer, and made payable to him in monthly installments over an agreed period—one to three years on automobiles and three to five years on house trailers. Thereupon, the dealer delivers the vehicle to his customer, with such memoranda or bill of sale as will enable him to register, license and use it.

Soon after completion of these procedures, these dealers sell (discount) those instruments (hereafter called "installment paper") to finance companies for an agreed or formula fixed price, and the dealers guarantee payment, in whole or in part, of the installment paper.

Under contracts between the respective dealers and finance companies here concerned, the latter, upon receipt and acceptance of installment paper, are obligated to pay immediately to the dealers a major percentage of the purchase price, but they are thereby also authorized to retain the remaining percentage of the price and to credit it on their books to a "Dealers Reserve Account" in the name of the particular dealer, for the purpose of securing performance by him of his guarantor, endorser, and other liabilities to the finance company.

The dealers involved in these cases recorded on their books in the years the installment paper was sold, and included in their income tax returns for those years, the cash received from the finance companies, but they did not accrue on their books or include in their returns the percentage of the price that was retained by the finance companies and credited to their reserve accounts.

The Commissioner contends that in the year of their sales of installment paper to the finance companies, the taxpayers acquired a *fixed right to receive*—even though not until a later year—the percentage of the purchase money that was retained by the finance companies and credited on their books to the dealers' reserve accounts in that year, and, hence, those amounts constituted accrued income to the taxpayers in that year, and should have been accrued on their books and included in their returns for that year. The taxpayers, on the other hand, contend that the amounts so retained and credited were never under or subject to their control, and were always subject to such contingent liabilities of the taxpayers to the finance companies that it could not have been known, in the year of the sales, how much, if any, of the reserves would actually be received by them in cash, and hence they did not acquire, in the year of any of the sales, a fixed right to receive—in a later year or at any time—the amounts credited to them in the reserves, and, therefore, the reserves did not constitute accrued income to them. This presents, in essence, the issue for decision in these cases.

On the grounds stated, the Commissioner proposed assessment of income tax deficiencies for certain years against the respective taxpayers here involved. The taxpayers each petitioned the Tax Court for a redetermination. After hearings, the Tax Court sustained the Commissioner in each case. The taxpayers petitioned for review. In No. 380, the *Hansen* case, the Ninth Circuit

reversed, 258 F. 2d 585; in No. 381, the *Glover* case, the Eighth Circuit reversed, 253 F. 2d 735; and in No. 512, the *Baird* case, the Seventh Circuit affirmed, 256 F. 2d 918. Because of an asserted conflict between those circuits in these cases, and between other circuits on the question involved,[1] and because of the importance of the question to the proper administration of the revenue laws, we granted certiorari in all three cases.

Inasmuch as these cases turn on the same issue, and the *Hansen* and *Glover* cases were consolidated for argument and argued together in this Court, and the *Baird* case was argued immediately following, it will be convenient to decide the three cases in one opinion. Although the relevant facts in the three cases are very similar and follow the pattern just explained, there are variations which we think should be set forth.

Respondents in No. 380, John R. Hansen and Shirley G. Hansen, are husband and wife and filed joint federal income tax returns for the taxable years 1951, 1952 and 1953 here involved. During those years, John R. Hansen ("taxpayer"), was a motorcar dealer in Bellevue, Wash-

---

[1] The Sixth Circuit in *Schaeffer* v. *Commissioner*, 258 F. 2d 861, sustained the Commissioner's position. Also the Tax Court since *Shoemaker-Nash, Inc.*, v. *Commissioner*, 41 B. T. A. 417 (1940), has by a long line of decisions consistently sustained the Commissioner's position.

On the other hand the Fourth Circuit has sustained the taxpayers' position in *Johnson* v. *Commissioner*, 233 F. 2d 952. And the Fifth Circuit has sustained the taxpayers' position in *Texas Trailercoach, Inc.*, v. *Commissioner*, 251 F. 2d 395, *West Pontiac, Inc.*, v. *Commissioner*, 257 F. 2d 810, and in several judgments (without opinions) entered on stipulations specifically presenting anew the same issue which that court had decided in *Texas Trailercoach, Inc.*, v. *Commissioner, supra*. In entering those judgments (in *United States* v. *Hines Pontiac*, 2 P-H Fed. Tax Rep. 2d 5694, *United States* v. *Modern Olds, Inc.*, 2 P-H Fed. Tax Rep. 2d 5713, and *Kilborn* v. *Commissioner*, 2 P-H Fed. Tax Rep. 2d 5812), the Fifth Circuit adhered to its decision in *Texas Trailercoach, Inc.*, v. *Commissioner, supra*.

ington, and kept his books on the accrual basis. He frequently sold automobiles on "time payments." The taxpayer was not bound by any contract to sell his installment paper, but because of his needs for operating capital he consistently sold it to General Motors Acceptance Corporation ("GMAC").

Although before selling installment paper to GMAC the taxpayer did not have an express contract with that company concerning the terms and conditions of such sales and purchases, he had received its manual covering its policies on those subjects and apparently acted under them. That manual was not put in evidence, but it is intimated in the evidence and findings and stated in the briefs, without contradiction, that it contained provisions to the effect that upon receipt and acceptance of a duly assigned conditional sale contract guaranteed by the dealer, GMAC would pay to the dealer the major percentage (not specified in the evidence or findings) of the agreed price therefor, but would retain the remaining percentage of the price and credit the same on its books to a "Dealers Reserve Account" in the name of the dealer, as security for performance of his obligations to GMAC under his guaranty of payment of the installment paper and for the payment of any other obligation which he might incur to GMAC. Once in each year GMAC would remit to the dealer so much of his accumulated reserve as exceeded 5% of the then aggregate unpaid balances on installment paper which GMAC had purchased from the dealer.

Upon negotiating a time sale of an automobile and receiving the down payment and any other sum immediately payable, the taxpayer prepared, on forms supplied by GMAC, a conditional sale contract setting forth a compilation of the figures, including insurance and a finance charge, involved in the time sale and concluding with a statement of the "Time (Deferred) Balance" which was

payable at the office of GMAC in fixed monthly install-
ments. When the customer signed and delivered to the
taxpayer the conditional sale contract, the automobile
was delivered to the customer and, as recited in that con-
tract, he acknowledged "delivery and acceptance of [it]
in good order." [2]

It was the taxpayer's consistent practice immediately
thereafter to assign the conditional sale contract (and
guarantee its payment) to GMAC by executing the form
of assignment printed at the foot of the form and forward-
ing it to GMAC for purchase.[3] Upon receipt and accept-

[2] At the very beginning of the form there is a recital that "The
undersigned seller. [the dealer] hereby sells, and the undersigned
purchaser or purchasers, jointly and severally, hereby purchase(s),
subject to the terms and conditions hereinafter set forth, the following
property, delivery and acceptance of which in good order are hereby
acknowledged by purchaser," and then follows a detailed description
of the automobile, and a computation of the amounts which support
the "Time (Deferred) Balance" that is payable by the purchaser in
monthly installments.

The reverse side of the form recites that "[f]or the purpose of
securing payment of the obligation hereunder, seller reserves title,
and shall have a security interest, in said property until said amount
is fully paid in cash." It then goes on to specify the various condi-
tions to be observed by the purchaser, which are usually found in
conditional sale contracts.

[3] That assignment, so far as pertinent, provides:

"For value received, undersigned [the dealer] does hereby sell,
assign and transfer to the General Motors Acceptance Corporation
his . . . right, title and interest in and to the within contract, here-
with submitted for purchase by it, and the property covered thereby
and authorizes said General Motors Acceptance Corporation to do
every act and thing necessary to collect and discharge the same.

"In consideration of your purchase of the within contract, under-
signed [the dealer] guarantees payment of the full amount remaining
unpaid hereon, and covenants if default be made in payment of any
instalment herein to pay the full amount then unpaid to General
Motors Acceptance Corporation upon demand. . . ."

ance of the conditional sale contract and assignment, GMAC remitted to the taxpayer the major percentage of the price it was to pay therefor, but retained the remaining percentage and credited it on its books to a "Dealers Reserve Account" in the name of the taxpayer, for the purpose of securing performance by him of his obligations to GMAC.

The taxpayer recorded on his books in the year such installment paper was sold, and included in his income tax return for that year, the cash received from GMAC, but he did not accrue on his books, or include in his return, the percentage of the price that was retained by GMAC and credited to his reserve account.

The Commissioner proposed the assessment of deficiencies in income taxes against the taxpayer and his wife for the years involved upon the grounds earlier stated. The taxpayer sought a redetermination in the Tax Court which, after hearing, sustained the Commissioner, but on taxpayer's petition for review the Ninth Circuit reversed, 258 F. 2d 585, and we granted certiorari for the reasons already stated, 358 U. S. 879.

Respondent in No. 381, Burl P. Glover ("taxpayer"), during the years 1949, 1950 and 1951 here involved, was a motorcar dealer in Pine Bluff, Arkansas, and kept his books and filed his income tax returns on a calendar year accrual basis. He frequently sold automobiles on time payments, the unpaid balance of the purchase price of each automobile, including insurance and a finance charge, being evidenced by the customer's promissory note payable to the dealer, or his order, in monthly installments over a fixed period, and secured by a chattel mortgage on the automobile.

Before the note and mortgage sales transactions here involved, the taxpayer signed a letter addressed to Universal C. I. T. Credit Corporation (obviously written on a form prepared by the addressee) proposing to sell to

Universal C. I. T. Credit Corporation ("C. I. T.") such of his notes and mortgages as he chose to sell and as were "acceptable to" C. I. T., and agreeing, among other things, to endorse with "full recourse" certain of the notes accepted and purchased by C. I. T., and to purchase from C. I. T. any automobile that it repossessed or recovered under a note and mortgage bought from him, at a cash price, payable on demand, equal to the then unpaid balance of the note and mortgage, or, failing in that obligation, to pay to C. I. T. the amount of any loss incurred by it in selling such repossessed automobile. The letter also stated that the provisions for "reserves as outlined in [C. I. T.'s] reserve arrangement effective at the time paper [was] purchased by [it]," would apply to such sales,[4] and that 3 times in each 12-month period, if the dealer was not then indebted to C. I. T., the latter would pay to the dealer so much of his reserves as exceeded 3% of the then aggregate unpaid balances on paper purchased from the dealer.[5]

---

[4] This record does not contain C. I. T.'s "reserve arrangement."

[5] The pertinent parts of the taxpayer's letter, referred to in the text, may be more fully summarized as follows: C. I. T. was to buy from the taxpayer such of his notes and mortgages as he chose to sell and as were "acceptable to" C. I. T. Some of the notes and mortgages were to be endorsed by the dealer to C. I. T. without recourse, but "paper covering commercial cars used for long distance hauling, commercial cars of more than two tons capacity, busses, cars used for taxi, jitney, 'drive-yourself' service, or cars sold to relatives or employees" was to bear the dealer's "full recourse endorsement."

Provisions for "reserves as outlined in [C. I. T.'s] reserve arrangement effective at the time paper [was] purchased by [it]," were to be applicable to such sales, but as earlier observed this record does not contain C. I. T.'s "reserve arrangement." Three times in each 12-month period, if the dealer was not then indebted to C. I. T., the latter would pay to the dealer his "accumulated reserves in excess of 3% of the then aggregate unpaid balances on paper purchased from [him]," but if C. I. T. stopped buying installment paper from

Upon consummating a time sale of an automobile with his customer in the manner stated, the taxpayer delivered the automobile to his customer, along with a bill of sale, subject to the mortgage, which enabled the customer to register, license and use it.

Soon afterward the taxpayer, pursuant to his letter to C. I. T. just referred to, endorsed the note (and assigned the mortgage) to C. I. T., in some cases without recourse and in others with full recourse, and forwarded the same to C. I. T. for purchase. Upon receipt and acceptance of the note and mortgage, C. I. T. remitted to the taxpayer the major percentage (not specified in the evidence or findings) of the agreed price therefor, but retained the remaining percentage and credited it on its books to a "Dealers Reserve Account" in the name of the taxpayer, for the purpose of securing performance by him of his obligations to C. I. T.

As in the *Hansen* case, the taxpayer recorded on his books in the year the installment paper was sold, and included in his income tax return for that year, the cash received from C. I. T., but he did not accrue on his books, or include in his return, the percentage of the price that was retained by C. I. T. and credited to his reserve

---

the dealer the former was authorized to "hold and apply all reserves until liquidation of all paper purchased from [the dealer was] completed."

The taxpayer was to purchase from C. I. T. "each repossessed or recovered car tendered at [the dealer's] place of business within 90 days after maturity of the earliest instalment still unpaid," at a price, payable on demand, equal to "the unpaid balance due on the car," or, if the dealer failed to do so, he was to pay to C. I. T. the amount of "any deficiency incurred by [C. I. T.] in the resale of such repossessed cars. . . ."

If because of prepayment of a note by a maker, C. I. T. refunded any part of a "service charge," the taxpayer agreed to pay to C. I. T. the same percentages, if any, of the refund as had originally been credited to his reserve account.

account. And, as in the *Hansen* case, the Commissioner proposed the assessment of deficiencies in income taxes against the taxpayer for the years involved upon the grounds earlier stated. The taxpayer sought a redetermination in the Tax Court which, after hearing, sustained the Commissioner, but, on the taxpayer's petition for review, the Eighth Circuit reversed, 253 F. 2d 735, and we granted certiorari for the reasons already stated, 358 U. S. 879.

Petitioners in No. 512, Clifton E. Baird and Violet L. Baird ("taxpayers"), are husband and wife and, during the years 1952, 1953 and 1954 here involved, they were also partners in a firm known as "Baird Trailer Sales" ("the partnership") which was engaged primarily in selling house trailers at Salem, Indiana. The partnership kept its books and filed its partnership (informational) income tax returns on a fiscal year accrual basis, but the taxpayers kept their personal books, and filed their returns, on a calendar year cash basis. During the years involved the partnership sold many of its trailers on "the installment basis," the unpaid purchase price of each trailer being evidenced and secured by an assignable or negotiable instrument, retaining in the partnership defeasible title to or a lien on the trailer, signed by the customer, delivered to the partnership, and payable to it in monthly installments over an agreed period.

The partnership was not legally obligated to sell its installment paper but its limited operating capital made it necessary, as a practical matter, to do so. Prior to the transactions here involved the partnership entered into contracts with Minnehoma Financial Company ("Minnehoma"), of Tulsa, Oklahoma, Michigan National Bank, of Grand Rapids, Michigan, and Midland Discount Corporation ("Midland"), of Cincinnati, Ohio, providing for the sale and purchase of such of the partnership's installment paper as it offered for sale and as those companies

were willing to buy, and throughout the years in question the partnership sold installment paper to each of those companies under those contracts.

It was provided in the Minnehoma contract that the partnership, among other liabilities assumed by it to Minnehoma, would unconditionally guarantee payment when due of all sums called for by any installment paper purchased from it, and that Minnehoma, upon receipt and acceptance of such installment paper, would remit to the partnership 95% of the agreed price to be paid therefor, but would retain the remaining 5% of the price and credit it (and also, if it wished, a portion of the "finance charge") to a reserve account on its books in the name of the partnership, as security for performance of all endorser, guarantor, and other liabilities of the partnership to Minnehoma.[6]

----

[6] The material parts of the contract between the partnership and Minnehoma may be summarized as follows: Upon receipt and acceptance of installment paper from the partnership, Minnehoma would remit to the partnership 95% of the price to be paid therefor, but would retain the remaining 5% of the price and credit it (and also, if it wished, a portion of the "finance charge" paid by the maker) to a reserve account on its books in the name of the partnership. The partnership unconditionally guaranteed payment when due of all sums called for by the installment paper, and guaranteed that the makers would perform all obligations assumed by them under that paper, and that in the event the makers failed to pay any installment when due or to keep any obligation assumed by them under the installment paper, the partnership would repurchase such installment paper from Minnehoma, upon demand, at a price equal to the unpaid balance thereon.

Minnehoma was authorized to charge against the partnership's reserve account any sums for which the partnership might be or become indebted to Minnehoma; and at such times as—after the payment of all contingent liabilities of the-partnership to Minnehoma—the amount then credited to the partnership's reserve account exceeded 15% of the aggregate unpaid balances of all outstanding installment paper so sold and purchased, Minnehoma would pay

·Under an oral contract with Michigan National Bank, the bank agreed that, upon receipt and acceptance of installment paper endorsed by the partnership with full recourse, it would immediately pay to the partnership a percentage (not specified in the evidence or findings) of the price to be paid therefor, but that the remaining percentage of the price would be retained and credited to a "reserve account" in the bank in the name of the partnership. That reserve account was contemporaneously assigned to the bank by the partnership under the "collateral assignment" shown in the margin.[7]

---

such excess, once each month, to the partnership; and when all installment paper purchased by Minnehoma from the partnership had been paid in full, Minnehoma would pay to the partnership the balance of its reserve account.

[7] "COLLATERAL ASSIGNMENT.

"For Valuable Consideration, the receipt of which is hereby acknowledged, the undersigned hereby sells, assigns, transfers, and conveys unto Michigan National Bank, of Grand Rapids, Michigan, its successors, and assigns forever, irrevocably, all of his, its, or their right, title and interest in certain sums of money now on deposit or that may hereafter be deposited in the Michigan National Bank, of Grand Rapids, Michigan, and identified and represented by Reserve account in the name of the undersigned in the Michigan National Bank.

"This Assignment and Transfer is made as collateral security for the payment of the direct and indirect liability of the undersigned to the said Michigan National Bank, of Grand Rapids, Michigan, and to secure the payment of the several notes representing said direct and indirect liability and any renewal or renewals thereof, or any installment payment or payments and to secure any obligation . . . which the undersigned may owe to said Michigan National Bank, of Grand Rapids, Michigan.

"In the event of default in the payment of said liability or any installment thereof, or any of the several notes at the time when same shall fall due or in the payment of the interest thereon or any part of the principal of said liability then the Michigan National Bank, of Grand Rapids, Michigan, at their election, notice of said election being hereby expressly waived, may apply the total of said

The contract with Midland was evidenced by two letters. In essence they stated that upon receipt and acceptance of installment paper, endorsed by the partnership with full recourse, Midland would "advance" 97% of the price to be paid therefor if on new trailers and 95% of the price if on used trailers, and that the "differentials of 3% and 5%" would be retained and credited on Midland's books to a reserve account in the name of the partnership, for the purpose of securing performance of its obligations to Midland.[8]  They also stated that, when a particular note has been paid out, the amount credited to the reserve on account of that note would be immediately paid to the dealer, and that when the "reserve fund exceeds 10% of [the partnership's] outstandings, the excess will be paid [to the partnership] automatically."

Here, as in the *Hansen* and *Glover* cases, the partnership did not accrue on its books, and the taxpayers did not include in their individual returns, in any of the

---

sums of money represented by said Reserve account at the date of election or any part thereof to meet the default in the liability.

"Whenever the indebtedness secured hereby is paid in full the Michigan National Bank, of Grand Rapids, Michigan, shall reassign said sums of money represented by said Reserve account along with all right, title and interest back to the undersigned.

"If in the opinion of the bank the undersigned dealer's account is in good standing, all sums in this reserve account in excess of ten per cent (10%) of the gross unpaid balance of all contracts outstanding on February 28 of each year will promptly be returned to the undersigned dealer."

[8] Midland's vice president who handled these transactions with the partnership testified relative to the purpose of the reserve as follows:

"A. Well, we buy this paper from all of our dealers on a straight endorsed basis, in other words, it's fully recoursed. If a trailer is given to a note-maker and the note-maker can't pay for it, the dealer has to take it back, [and] if he can't pay us . . . the net pay-off on the trailer, we would take the reserve money to liquidate the account."

years here involved, the amounts that were retained by Minnehoma, Michigan National Bank and Midland and credited on their respective books to the partnership's reserve accounts, and, again, as in the *Hansen* and *Glover* cases, the Commissioner proposed assessment against the taxpayers of deficiencies in income taxes for the years involved upon the grounds previously stated. Similarly, the taxpayers sought a redetermination in the Tax Court which, after hearing, sustained the Commissioner. On the taxpayers' petition for review, the Seventh Circuit affirmed, 256 F. 2d 918, and we granted certiorari for the reasons already stated, 358 U. S. 918.

We turn, first, to the taxpayers' contention that, in substance, the purchaser, not the dealer, obtains the loan directly from a finance company, and that the percentage of the loan which is retained by the finance company— although credited on its books to a reserve account in the name of the dealer as collateral security for the payment of his liabilities to the finance company—is the property of the purchaser of the vehicle, not the dealer, and therefore may not be regarded as accrued income to the dealer.

The basis of the contention (filling in the omitted but necessarily involved steps) is that each of these transactions is a single, "three-cornered" one between the dealer, the finance company and the purchaser; that, in substance, the dealer agrees to sell the vehicle to the purchaser for "a down payment plus cash" (the term "cash" as here used must necessarily refer to the unpaid balance of the purchase price); that the purchaser agrees immediately to obtain from the finance company, and it agrees to make to the purchaser, a loan, on the security of the vehicle, in an amount at least equal to the unpaid balance of the purchase price owing by the purchaser to the dealer for the vehicle; and that the purchaser agrees immediately to pay, or to direct the finance company to pay, to the dealer, out of the proceeds of the loan, an

amount equal to 95% (in most instances) of the unpaid balance of the purchase price owing by the purchaser to the dealer for the vehicle. Although this leaves an unpaid balance of the purchase price of the vehicle (5% in most instances) still owing by the purchaser to the dealer, it also leaves in possession of the finance company, out of the proceeds of the loan, an amount at least equal to that 5%. Nevertheless the purchaser, with the consent of the dealer, agrees with the finance company that the latter shall retain that 5% and credit it on its books to a reserve account in the name of the dealer, as collateral security for the payment of his contingent liabilities to the finance company. On these assumptions of fact the taxpayers contend that the reserves retained by the finance companies, though credited on their books to the dealers' reserve accounts, are only contingently so credited and are subject to cancellation if the purchaser fails to pay out his loan and, at all events, the reserves belong to the purchasers, and should not be regarded as accrued income of the dealers.

The Ninth Circuit in the *Hansen* case, heavily relying upon the opinion of the Fifth Circuit in *Texas Trailer-coach, Inc.,* v. *Commissioner,* 251 F. 2d 395, adopted this theory and largely rested its decision upon that ground, 258 F. 2d, at 588, and, to a lesser extent, so did the Eighth Circuit in the *Glover* case, 253 F. 2d, at 737. The taxpayers contend here that such is the substance, if not the form, of their transactions and that, inasmuch as taxation depends on substance and not on form, the *Hansen* and *Glover* cases should be affirmed and the *Baird* case should be reversed on this ground alone.

We agree, of course, that the incidence of taxation depends upon the substance, not the form, of the transaction, *Commissioner* v. *Court Holding Co.,* 324 U. S. 331, 334; *Helvering* v. *F. & R. Lazarus & Co.,* 308 U. S. 252, 255; *Bowers* v. *Kerbaugh-Empire Co.,* 271 U. S. 170, 174;

*Weiss* v. *Stearn,* 265 U. S. 242, 254; *United States* v.
*Phellis,* 257 U. S. 156, 168, but we think that the tax-
payers have assumed facts which are contrary to the
records and are wholly without substance.

These records clearly show that, in every instance, the
installment paper was executed by the purchaser and
made payable to the dealer (though in the *Hansen* case
"at the office of" GMAC, and in the *Baird* case "at the
office of" Minnehoma), and that the same was later
assigned or endorsed by the dealer and sent to the finance
company for purchase, under and subject to the dealer's
contractually assumed contingent liabilities to the finance
company respecting it,[9] and that, in every instance,

---

[9] The record in the *Hansen* case shows that the conditional sale
contracts were made between the dealer and the purchaser of the
vehicle, and that the latter acknowledged to the dealer "delivery
and acceptance of [the automobile] in good order" (see Note 2);
that the dealer consistently assigned his conditional sale contracts to
GMAC by executing the form of assignment printed at the foot of
the form and sending the same to GMAC for purchase, guaranteeing
payment of the full amount remaining unpaid thereon and covenant-
ing that if default be made in the payment of any installment thereof
to pay the full amount then unpaid to GMAC upon demand (see
Note 3).

The record in the *Glover* case shows that the notes and mortgages
were payable to the dealer and that, upon a sale of them, he en-
dorsed them, in some cases without recourse and in others with "full
recourse," and forwarded them to C. I. T. for purchase, subject,
of course, to the various obligations he had undertaken to C. I. T.
in respect thereto that are shown in Note 5.

The record in the *Baird* case shows that the partnership entered
into contracts with its customers, taking assignable or negotiable
instruments retaining defeasible title to or a lien on the trailers
evidencing and securing the unpaid purchase price of the trailers;
that it assigned its conditional sale contracts to Minnehoma with the
guaranties and covenants shown in Note 6; that it endorsed with
full recourse, sold and delivered to Michigan National Bank certain
of its notes and mortgages, under the further guaranties contained

the finance company, upon receipt and acceptance of the installment paper and of the dealer's obligations respecting it, immediately paid to the dealer a major percentage of the agreed or formula fixed price for the paper; but, pursuant to the terms of the dealer's contract with the finance company, the latter retained the remaining percentage of the price and credited it on its books to the dealer's reserve account, as collateral security for the payment of his contingent liabilities to the finance company on such installment paper.

It is therefore clear that the retained percentages of the purchase price of the installment paper, from the time they were entered on the books of the finance companies as liabilities to the respective dealers, were vested in and belonged to the respective dealers, subject only to their several pledges thereof to the respective finance companies as collateral security for the payment of their then contingent liabilities to the finance companies.

This brings us to the question whether amounts of purchase price withheld by finance companies as security to cover possible losses on installment paper purchased from dealers, who employ the accrual method of accounting, constitute income to them at the time the withheld amounts are recorded on the books of the finance companies as liabilities to the dealers.

The principles governing the accrual and reporting of income by taxpayers who employ the accrual basis have long been settled by the opinions of this Court, *Security Flour Mills Co.* v. *Commissioner,* 321 U. S. 281; *Spring City Foundry Co.* v. *Commissioner,* 292 U. S. 182, 184;

---

in the "collateral assignment" shown in Note 7; and that it also endorsed with full recourse, sold and delivered other of its notes and mortgages to Midland, and authorized it to retain a percentage of the purchase price to secure performance of its endorser liabilities to Midland. See Note 8.

*Brown* v. *Helvering,* 291 U. S. 193, 199. In *Spring City Foundry Co.* v. *Commissioner, supra,* Chief Justice Hughes, speaking for the Court, said:

> "Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues." 292 U. S., at 184–185.

Those principles are not questioned here, but the parties differ respecting their application to the facts of these cases. The taxpayers contend, first, that they cannot *presently* compel the finance companies to pay to them the amounts of their reserve accounts, and therefore they have not acquired a *presently enforcible right to recover* those reserves, and, hence, they should not be deemed to constitute accrued income to them. Inasmuch as these records show that the pay-out period for automobiles varies from 12 to 36 months and for house trailers from 36 to 60 months, it is doubtless true that the taxpayers, having pledged their reserve accounts to the finance companies as collateral security, cannot presently compel the finance companies to pay over their reserves. But the question is not whether the taxpayers can presently recover their reserves, for, as stated, it is the time of acquisition of the *fixed right to receive* the reserves and not the time of their *actual receipt* that determines whether or not the reserves have accrued and are taxable.

The taxpayers next contend that the amounts that were retained by the finance companies and entered on their books as liabilities to the dealers under their reserve accounts, were subject to such contingencies that it could not have been known, in the year of such reten-

tions and credits, what amount of those reserves would actually be received by them and, hence, they did not acquire, in the year of such retentions and credits, a fixed right to receive—in a later year or at any time—the amounts so withheld and credited to them, and therefore those amounts did not constitute accrued income to them.

It is true that the amounts retained by any one of the finance companies, and entered on its books as a liability to a particular dealer, are subject to such liabilities as the dealer may have contractually assumed to the finance company, but only the obligations of the dealer to the finance company arising from those liabilities may be offset against a like amount in the dealer's reserve account. Hence, those liabilities and obligations provide the only conditions that can affect full cash payment to the dealer of his reserve account. No amount may be charged by the finance company against the dealer's reserve account which he has not thus authorized.

It follows that only one or the other of two things can happen to the dealer's reserve account: (1) the finance company is bound to pay the full amount to the dealer in cash, or (2) if the dealer has incurred obligations to the finance company under his guaranty, endorsement, or contract of sale, of the installment paper, the finance company may apply so much of the reserve as is necessary to discharge those obligations, and is bound to pay the remainder to the dealer in cash.

Does the dealer "receive" funds which are so taken from his reserve account and applied to the payment of his obligations to the finance company? The dealer agreed in his contract with the finance company to receive his reserve in offset payment of his obligations to the finance company and the balance in cash. It would therefore seem that funds in the dealer's reserve which are applied to the payment of his obligations to the finance

company are as much "received" by him as those which the finance company pays to him in cash. The Seventh Circuit took that view in the *Baird* case, saying:

> "Ultimately only two things could happen to the funds in the dealer's reserve accounts: either the amounts would be paid to the partnership in cash or they would be used to satisfy the partnership's other obligations to the finance companies." 256 F. 2d, at 924.

In any realistic view we think that the dealer has "received" his reserve account whether it is applied, as he authorized, to the payment of his obligations to the finance company, or is paid to him in cash.[10]

It follows that the amounts (of purchase price of the installment paper) that were withheld by the finance companies constituted accrued income to these accrual basis dealers at the time the withheld amounts were entered on the books of the finance companies as liabilities to the dealers, for at that time the dealers acquired a fixed right to receive the amounts so retained by the finance companies.

The taxpayers complain that such a holding will unfairly require them to pay taxes upon funds which are not available to them for that purpose. Though the funds are not presently available to the taxpayers for the payment of taxes, they are nevertheless owned by the taxpayers, and the latter cannot expect to collateralize their liabilities, for periods running from 1 to 5 years, by the use of their accrued but untaxed funds. Moreover, it is a normal result of the accrual basis of accounting and reporting that taxes frequently must be paid on accrued

---

[10] Cf. *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, 729; *Douglas* v. *Willcuts*, 296 U. S. 1, 9; *Tressler* v. *Commissioner*, 228 F. 2d 356, 359, n. 6 (C. A. 9th Cir.).

funds before receipt of the cash with which to pay them, just as the Ninth Circuit stated in the *Hansen* case, 258 F. 2d, at 587. See *Security Flour Mills Co.* v. *Commissioner,* 321 U. S. 281, 284–285.

To permit accrual basis taxpayers to escape accrual and taxation, in a particular year, of such portions of their sales as they may permit to be retained by buyers, as collateral security, well might violate § 42 (a) of the 1939 Internal Revenue Code as amended,[11] and, moreover, might well afford opportunities to accrual basis taxpayers to allocate income to years deemed most advantageous.

The Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income, *Lucas* v. *American Code Co.,* 280 U. S. 445, 449; *Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180, 189–190, and under § 41 of the Internal Revenue Code of 1939, 26 U. S. C. (1952 ed.) § 41, the Commissioner, believing that the accounting method employed by a taxpayer "does not clearly reflect the income," may require that "computation shall be made in accordance with such method as in [his] opinion . . . does clearly reflect the income." Since 1931 the Internal Revenue Service has consistently maintained that amounts withheld by finance companies to cover possible losses on notes purchased from dealers constitute income to dealers, who employ the accrual method of accounting, from the time the amounts are recorded on the books of

---

[11] Section 42 (a) (as amended by § 114, Revenue Act of 1941, c. 412, 55 Stat. 687), 26 U. S. C. (1952 ed.) § 42, so far as pertinent, provides:

"(a) *General Rule*—The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period."

the finance companies as liabilities to the dealers.[12]    That position, in general, accords with our view.

The taxpayers have argued that portions of the Dealers Reserve Accounts consist of percentages of "finance charges"[13] which the finance companies agreed to allow them, and that such percentages of the "finance charges," not being a part of the purchase price of the installment paper, should in no event be regarded as accrued income to the dealers.    However, the respective taxpayers, each of whom had the burden of showing that he did not owe the taxes which the Commissioner proposed to assess against him, wholly failed to adduce evidence to support their claims.    They failed even to adduce evidence showing whether any percentages of the "finance charges" that may have been allowed to them by the respective finance companies were entered on the books of the finance companies as credits to the respective "Dealers Reserve Accounts," and if so, whether such percentages of the "finance charges" so credited had been identified and separated in character and amount from the percentages of the purchase price of the installment paper that were retained by the finance companies and entered on their

[12] The first publication of its views was in G. C. M. 9571, X–2 Cum. Bull. 153 (1931).   Its most recently published views on the subject are contained in Rev. Rul. 57–2, 1957–1 Cum. Bull. 17, which, so far as pertinent, provides:

"Amounts withheld by banks or finance companies to cover possible losses on notes purchased from dealers constitute income to dealers employing the accrual method of accounting, to the extent of their interest therein at the time the amounts are recorded on the books of the bank or finance company as a liability to the dealer . . . ."

[13] As to the term "finance charges," the records and briefs in these cases make one thing clear: it is not a term of art.   Its meaning appears to be both erratic and elastic.   Nor have we been told by any one of these taxpayers what he intends to be included in his use of the term.

books as liabilities to the dealers in their respective Dealers Reserve Accounts. For these reasons the respective taxpayers have wholly failed to sustain the burden of showing that any part of the amounts credited on the books of the finance companies to the respective Dealers Reserve Accounts was entitled to special treatment.

The judgments in No. 380 and No. 381 are reversed and the judgment in No. 512 is affirmed.

MR. JUSTICE DOUGLAS dissents.

MR. JUSTICE BLACK took no part in the consideration or decision of these cases.