The FAME TOOL & MANUFACTURING
CO., Inc., Complainant,

v.

COMMISSIONER OF INTERNAL REVE-
NUE, United States of America,
Respondent.

No. 5860.

United States District Court,
S. D. Ohio, W. D.

Aug. 4, 1971.

Robert O. Smith, Cincinnati, Ohio, for
complainant.

D. Patrick Mullarkey, Dept. of Justice,
Tax Div., Washington, D. C., for respond-
ent.

## MEMORANDUM OF DECISION

PORTER, District Judge:

This is a suit for refund of income
taxes, the outcome of which depends on
whether an IRS order that the taxpayer
change his method of accounting for in-
ventory was arbitrary. The taxpayer is
a "pure" tool and die manufacturer, as
distinguished from a precision manu-
facturer.

The particular taxpayer, since its in-
corporation in 1956 (when it succeeded a
partnership composed of the two stock-
holders of the corporation) has had the
accrual method of accounting. However,
inventory was figured on the basis of
cost of materials. Labor and overhead

were not accrued for that purpose. The order in question required that labor and overhead be accrued.

The parties stipulate (see pretrial order) that the Commissioner's order to accrue labor in arriving at inventory would be a change in accounting methods. Other pertinent facts which are either shown as uncontested in the pretrial statements or which are not controverted are as follows:

The taxpayer manufactures custom production tooling on order. It has no finished goods inventory. It has a substantial amount of work in progress. The average length of time it takes to complete an order (known as lead time) is one to two weeks, and the taxpayer does not, as some of its competitors do, engage in the manufacture of any product which is stockpiled.

Also, due to the fact that the end product manufactured by plaintiff is to the order of the customer, if the tool or die is not to specifications, it is rejected and must be scrapped. The percentage of rejects varies widely and ranges anywhere from two to twenty percent.

The taxpayer has been consistent in employing the method of accounting for inventory which is called into question in this case. The predecessor partnership was also consistent in the use of such accounting methods.

Many small tool and die workers use the same method. The taxpayer (and presumably such other tool and die companies) keep a record of the labor that goes into a particular job on the shop order as a means of enabling them to check on the validity of estimates and evaluate the work of the employees who did the job. Presumably this information on shop orders as to the labor accrued on the job could be used to accrue labor in closing inventories.

The transaction transferring the partnership assets to the newly formed corporation was reviewed by agents of IRS with the taxpayer and his counsel to determine whether the basis of the assets in the hands of the corporation was the same as that listed by the partnership.

It is also uncontroverted that tool makers are in short supply and in order to keep them it is not uncommon for small tool and die makers such as plaintiff to take jobs at a loss to make sure they will have help available for profitable jobs.

The contested issues of fact are whether the plaintiff's method of accounting conformed as nearly as possible to the best accounting practice in the trade or business and whether such accounting clearly reflected income. These are really mixed questions of law and fact. On such issues, expert and other testimony was offered which merits close examination.

However, we begin by noting the taxpayer's answer when he was asked why he believed the method he used is "best." Asked why the method is "best," taxpayer answered:

"A  The way we are doing it for the simple reason once we bill something and we can't sell it for various reasons, the value of that particular thing is scrapped. I mean the market value of a thing we bill, unless our customer accepts it, is zero. This is why we went the way we did; and the true reflection of income.

We haven't any income until somebody buys it, and the only person who can buy it is the person we are making it for. We are not a product * * *"

Next we compare the testimony of two experts called to testify for the taxpayer and the government, respectively. The first was F. A. Benadum, a lawyer who specialized in accounting and is a C.P.A. He has a law office, but is part-time regional administrator of the National Tool and Die Association and executive secretary of the Cincinnati Tool and Die Association, which has 34 members. In this capacity he conducts training programs and gets into tax and accounting matters. He testified that in a *pure* tool and die outfit there are very

few, if any, who accrue overhead and labor in inventory because there is no product for sale until the job is 100% complete, shipped and accepted.

"A  In a pure tool and die shop, to the best of my knowledge, there are very few, if any, that do accrue for labor and overhead as such, at least the ones that I have talked to.

"Q  Do you know the reason why?

"A  Well, I have had numerous discussions in this area, and many of them have even taken a position that every job that comes in there is purely research and development job. And as such, they do not have a product for sale until the job is a hundred percent complete, shipped and accepted by the customer. (tr. 5–6).

\*　\*　.\*　\*　\*　\*

"Q  Now Mr. Benadum, keeping in mind your experience by way of education, training, your professional calling since you have become both a certified public accountant and a lawyer and your experience in the industry and confining your answer to what we have described here as a pure tool and die operation, do you have an opinion as to what is the best method of accounting of inventories?

"A  Yes, I do.

"Q  And what is that opinion?

"A  My opinion is that the best accounting of inventories in a pure tool and die shop, based on my prior education and my experience, would be solely the material or scrap value of the article being worked on.

"Q  Now, laying or repeating the same foundation as I did for the previous question, do you have an opinion as to whether the material cost only of accounting of inventories clearly reflects income?

"A  Yes, I do have an opinion.

"Q  And what is that opinion?

"A  My opinion is that it would clearly reflect income in a pure tool and die shop.

"Q  Repeating the same foundation for the two previous questions, I will ask you whether you have an opinion in relation to a pure tool and die shop as to whether the accounting of inventories is even necessary to reflect true income?

"A  This, of course, would depend upon the amount of material on hand in any individual shop at the end of the year.

"Q  Assuming further in relation to that question that the practice was consistent, in other words, whatever was done at the beginning of the year was done at the end of the year, with that added foundation and assumption, do you have an opinion as to whether the inclusion of inventories in accounting method would distort or not distort income?

"A  Yes, I do.

"Q  And what is the opinion?

"A  If only the material portion were included at both the beginning and end of the year, income would not be materially distorted.

"THE COURT: What was the last, please?

"THE WITNESS: It would not be materially distorted if only the cost of material were included at both the beginning and the end of a given year (tr 7–9).

\*　\*　\*　\*　\*　\*

"A  \*  \*  \* There is going to be no appreciable difference in the income of The Fame Tool & Manufacturing Company if their income is both consistent at the beginning and the end of a year (tr. 15).

\*　\*　\*　\*　\*　\*

"Q  On the other hand, would the accrual of labor and overhead accurately reflect income in a year where there is an appreciable percentage of rejects?

"A  I don't believe it would any more clearly reflect income than by expensing it at the end of the year (tr. 16).

\* \* \* \* \* \*

"THE COURT: There was something that was said there that made me wonder if you accrued labor for the purpose—he accrues labor for the purpose, as he said, of estimating—

"THE WITNESS: He keeps track of it so he knows whether he made a profit or a loss on a job and so he can see where his strong points are in the plant as far as getting the work out. In other words, he might have a good jig borer or a good lathe operator and he can figure that this fellow can do the job faster in less time" (tr. 16–17).

Next, before proceeding with the comparison of the testimony of the experts, it needs to be noted that the "Accounting Manual for the Tool & Die Industry" (px 5) states as follows as to work in process inventory (page 40):

"At the end of each accounting period, inventories must be adjusted to reflect operations of the period. The purchase journal is used for entry of material and direct labor expenses into the 'in process' job orders. To close the accounting records for each period, overhead should be set up in inventory. The valuation for completed jobs must be removed from the work in process inventory."

In connection with the Manual, it was brought out that it was prepared by an operator who apparently had a larger operation than the plaintiff's. Actually, it was a committee headed by such a man, but it was a committee of the National Tool and Die Association working with Ernst & Ernst. The chairman had a company with 500 to 550 people—probably the largest precision machining shop in the Association, and it manufactured products (tr. 23).

Finally, Mr. Benadum was not able to cite any authority to support his theory of not showing work in process (tr. 24). In short, his opinion is that the method used by the taxpayer conforms to the best in the trade and correctly reflects income.

A long-term tool and die maker, an official of the National Association and present member of its executive committee, Charles L. Brinkman, when asked whether other pure tool and die makers used the same method that the taxpayer employs in accounting for inventory, answered, "Some do, and some don't."

In explanation he said that those who don't, in most instances, were on a cash basis, until ordered to change by IRS. He also said that market value of work in progress is nothing.

Turning to the government expert, who is also a C.P.A. and an employee of IRS who has examined many corporate returns, in most of which inventory accounting methods were under scrutiny (tr. 25), an examination of his testimony will show that he is strongly of the opinion that the taxpayer's method is not "acceptable under general accounting practices or concepts" (tr. 26) "because it does not show as an asset in the balance sheet the amount of labor and overhead which is accrued at the time the balance sheet is taken off—accrued in work in process" (tr. 27).

Though it is less clear, an examination of this witness' testimony will show that he also believes the taxpayer's method distorts income because it is highly unlikely that the same inventory would be in process at the beginning as the end of a year, particularly if there is an expanding business (tr. 21). (See also tr. 26–28 and the pages which follow for the testimony of this witness.)

In brief the witness emphasized that the taxpayer's method is not good; that an accountant cannot overlook work in process as an asset in the preparation of a balance sheet. He was not troubled by the fact that if the accrual method is used a problem may arise if the tool or die turns out to be unsaleable (tr. 28), or if it is rejected for any reason. He said it could be written off at the end of the year (tr. 29, 34), or, if unsaleability cannot be determined, a reserve could be set up (tr. 29).

He explained why good accounting practice requires that inventory reflect the value of work in process (tr. 29, et seq.) and said the value of this for people reading a balance sheet does not depend on the market value where there is a firm contract, such as there is when a tool or die is produced pursuant to a purchase order. He considered it universally accepted "that costs govern in a situation of this nature" and, as indicated above, said that if the volume of work in process is greater at the end of the year than at the beginning, the use of the taxpayer's method distorts income (tr. 30–32).

So much for the comparison of the testimony of the experts. In considering such testimony we have concluded that the questions about plaintiff's method of accounting for inventory are to be answered not only on the basis of such testimony and the manual which has been mentioned, but on the basis of the law which will be discussed herein.

Our analysis of the foregoing testimony, evidence, and law bearing on the issue leads to the finding and conclusion that the taxpayer's method of not including work in process in closing inventory, though it is the same as that method employed by many, if not most, "pure" tool and die makers, does not conform to the "best" in the trade. Furthermore, in view of the fact that it is highly unlikely that the amount of work in process will be the same at the end of various accounting periods as it was in the beginning, the failure to include work in process in closing inventory does distort income somewhat.

## CONCLUSIONS OF LAW

First, we look at two of the pertinent statutes and two regulations on inventories. These are well summarized in Wilkinson-Beane, Inc. v. C. I. R., 420 F. 2d 352, 354 (1 Cir., 1970):

"Section 446(b) of the Internal Revenue Code of 1954 provides in part that if the method of accounting regularly employed by the taxpayer 'does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.' Section 471 empowers the Commissioner, when in his opinion 'the use of inventories is necessary in order clearly to determine the income of any taxpayer,' to require inventories. Treas.Reg. § 1.471–1 (1958) provides that '[i]n order to reflect taxable income correctly, inventories * * * are necessary in every case in which the *production*, purchase, or sale of *merchandise* is an income-producing factor.' Completing the statutory scheme, Treas.Reg. § 1.446–1(c) (2) (i) (1957) states that '[i]n any case in which it is necessary to use an inventory the accrual method of accounting must be used with regard to purchases and sales unless otherwise authorized under subdivision (ii) of this subparagraph.' " (Emphasis added.)

Plaintiff's first point is that a small tool and die production is a service and therefore there is no "merchandise" or any "production" within the meaning of those terms as used in Section 471, 26 U.S.C., and the regulations thereunder.

■ The government contends this ground for plaintiff's claim was not presented to IRS for consideration and therefore cannot be raised in this Court. If it is a "new" ground, that would be correct because the Court cannot consider a ground for a claim for refund which has never been presented to IRS. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619 (1933); Union Pacific R. R. Co. v. United States, 389 F.2d 437, 182 Ct.Cl. 103 (1968).

We are unable to find anything on the record to indicate the grounds for plaintiff's claim before IRS. However, as we view the plaintiff's contention that it is a service and there is therefore no production and no "merchandise," it is the same as the contention it has made throughout that it does not have any merchandise or stock to inventory. As we have understood it all along, the

plaintiff's position has been that the reason that he says his method of accounting is the "best" in the trade is because he has no merchandise or stock and that is because he is performing a service.

■ In any event, in Wilkinson-Beane, *supra*, the Court *acknowledged* that the taxpayer (an undertaker) essentially performed a service. Despite this, the Court concluded that caskets used in the business were "merchandise" which produced income, and thus upheld the Commissioner's adjustment of the taxpayer's accounting method. Hence, the plaintiff is subject to the pertinent statutes and regulations on inventories, even if he is partly or mainly performing a service. In this connection, however, we must say that there is merit to the defendant's argument that since the plaintiff could subcontract (inasmuch as the customer is obviously only interested in getting a tool or die to his specifications, regardless of who made it), this detracts from the argument that he is performing a service and therefore there is no "merchandise" or "production." This leads to the plaintiff's second assertion, which is that if inventories of work in process can be required, his method of accounting complies with section 461 in that it clearly reflects income and conforms to the best in the trade. Plaintiff therefore asserts that the Commissioner has abused his discretion under that section by requiring a change in accounting methods.

As noted, section 471 expressly provides that the Commissioner may require inventories if that is necessary "clearly to determine the income of any taxpayer." 26 U.S.C. Pursuant to that Regulation 1.471–1 provides in part:

"Inventories * * * are necessary in *every* case in which the production, purchase or sale of merchandise is an income-producing factor." (Emphasis added.)

In Frank K. Wikstrom & Sons, Inc. v. C. I. R., 20 T.C. 359 (1953), a machine tool maker continued the same accrual method of accounting he used as proprietor after the business was incorporated. The Commissioner recomputed closing inventories by allocating a portion of the total overhead expense based on the relation of the number of production hours represented in the closing inventory to the total production hours of the year. The Tax Court held that the term "merchandise" was intended to cover the type of articles manufactured by the taxpayer. In *Wikstrom,* as in the instant case, the product was made exclusively pursuant to contract and according to specifications provided by the buyer. Also, the product, if not according to specifications, could not be sold to others and therefore had to be scrapped. However, costs and expenditures for materials, engineering and services, and the indirect expenses incurred by the plaintiff for a given order not only could be, but were (for purposes of determining costs), assigned by the taxpayer to the tools and dies produced. Thus Wikstrom's business was one in which there was a product to which revenues and expenses could readily be assigned.

"* * * The wording of sections 446(b) and 471 makes clear that, in matters of accounting methods, the [Commissioner] is invested with broad discretion." All Steel Equipment, Inc. v. C. I. R., 54 T.C. 1749 (1970).

"* * * These provisions have been a part of our tax law for many years, and they have been interpreted as imposing an extremely heavy burden on taxpayers challenging the [Commissioner's] determinations—the Supreme Court has gone so far as to require a showing that such determinations are 'plainly arbitrary' (citations omitted). Thus it appears to be a long standing and well established policy of our tax system that since we have found the [taxpayer's] method of accounting does not clearly reflect income, we should accept the method proposed by the respondent, unless it is shown that such method is arbitrary—we are not

to fashion a different method merely because it may appeal to our sense of equity." *Id.*

See also, Lenox Clothes Shops v. C. I. R., 139 F.2d 56 (6 Cir., 1943); C. I. R. v. Joseph E. Seagram & Sons, Inc., 394 F. 2d 738 (2 Cir., 1968); E. W. Bliss Co. v. United States, 224 F.Supp. 374 (N.D. Ohio, 1963), aff'd 351 F.2d 449 (6 Cir., 1965). And see Lincoln Electric Company v. C. I. R., 444 F.2d 491 (6 Cir. 1971).

In *Lincoln Electric, supra,* the Commissioner was upheld in requiring that Lincoln include in its annual "bonus" to each of its employees as a "cost" of the production of the year-end inventory. The Tax Court found that without including the bonus, the year-end inventory did not reflect the full value of that inventory. The Court of Appeals noted:

"Internal Revenue Code of 1954, § 446 (a) provides the general rule for computing taxable income and authorizes the computation on the basis of the regularly used accounting practices. However, Section 446(b) authorizes the Internal Revenue Service to require a different method if the regular method 'does not clearly reflect income.' It is clear that 'the Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income.' Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, at page 467, 79 S.Ct. 1270 at page 1282, 3 L.Ed.2d 1360 (1959). These broad powers are limited as stated by this Court in Glenn v. Kentucky Color and Chemical Co., 186 F.2d 975 (6th Cir. 1951) at page 977:

"'But the Commissioner's authority to order a change in accounting methods when the taxpayer has regularly employed a consistent method depends upon his finding that the taxpayer's method does not clearly reflect income.' [and see authorities therein cited.]"

We find the decision in *All Steel Equipment, supra,* very helpful on the problems which this case presents. Before we extend our discussion thereon, however, we digress to take note of what the Court said in Allen M. Campbell Co. v. Lloyd Wood Construction Co., Inc., 446 F.2d 261 (5 Cir. 1971). This is deemed pertinent even though the question of accounting before the Court arose in a nontax context, namely, on review of a District Court ruling on a decision of the Small Business Administration which involved the use of "completed contracts" method of proving low-bidder status. The Court pointed out that:

" * * * it is an axiom of judicial review that an administrative agency's interpretation of its own regulations must be accorded the greatest deference. Udall v. Tallman, 1965, 380 U. S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed. 2d 616 * * *; Bowles v. Seminole Rock & Sand Co., 1945, 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702. When * * * that interpretation obviously incorporates quasi-technical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme, judges should be particularly reluctant to substitute their personal assessment of the meaning of a regulation * * *."

The Court went on to say something which is also pertinent here, namely:

" * * * Courts have not demonstrated any great competence in either discerning or applying the sometimes esoteric mysteries of this profession [accounting]."

In *All Steel Equipment, supra,* the Court upheld the Commissioner's order requiring a change in the taxpayer's method of accounting for inventories from "prime cost" to "absorption." The taxpayer argued mightily that the prime cost method clearly reflected its income since it had consistently used such method over many years and its taxable income computed under such method would not materially differ from its taxable income resulting from the use of the ab-

sorption method. Since prime costing was not found to be a generally accepted accounting procedure, the Court turned to materiality, and said:

"For tax purposes, there is no rule excusing a taxpayer from paying deficiencies which are relatively immaterial. Moreover, the doctrine of materiality in commercial accounting does not have the same significance it would have if applied to tax controversions."

The Court said their conclusion on materiality was limited to cases in which the method of accounting in issue complied with neither applicable tax regulations nor generally accepted accounting procedures. In that connection we can only conclude that the accounting method of the taxpayer in the instant case has not been shown to be a generally accepted accounting procedure. Neither has it been shown to comply with the applicable tax regulations, even though many, if not most, small tool and die operators use the same method.

■ As pointed out by the Court in *All Steel Equipment, supra,* 54 T.C. at 1757, on the authority of Photo-Sonics, Inc. v. C. I. R., 357 F.2d 656 (9 Cir., 1966) and Dearborn Gage Co. v. C. I. R., 48 T.C. 190 (1967), the consistent use of an erroneous method does not justify its continued use  The Court further indicated that at most, materiality will be considered a factor in situations involving permissible alternative methods. In that connection, we cannot conclude that the method being used by the taxpayer is such a "permissible alternative method."

Even though courts may not have demonstrated competence in the area of accounting, as noted above, they nevertheless are required to construe the Code's provision in accordance with well established and accepted accounting practices. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); C. I. R. v. Joseph E. Seagram & Sons, Inc., *supra*. As to established and accepted accounting practices on inventories, it has been observed:

"* * * The use of inventories in computing income results in stating the expenses of a year's operations in terms of the cost of the goods actually sold during that year; * * *" Caldwell v. C. I. R., 202 F.2d 112, 114 (2 Cir., 1953).

Also, we find that accounting practices dealing with work in process recognize at least three accounting methods dealing with costs, outlined in Treas. Reg. 1.471–3(c). One method, "prime cost" accounting, allocates only the cost of direct labor and direct materials to the cost of work in process inventory. That method was rejected in *Photo-Sonics, supra.* (The decision expressly refused to "lay down any broad principles applicable to inventories.") In a second accounting method, "direct costing," direct labor, materials, and *variable* overhead factory expenses are allocated to work in process inventory cost. This method was recognized by the Tax Court in McNeil Machine & Engineering Co. v. United States, 1967 USTW 616 (3/29/67, Ct.Cl. Commissioner's Report). And the third method, "absorption costing," also allocates *fixed* overhead expenses to the work in process inventory costs. This is the principal method contemplated by Treas.Reg. 1.471–3(c) since no distinction is made between *fixed* and *variable* overhead. See also Dearborn Gage Co. v. C. I. R., 48 T.C. 190 (1967).

Here the Commissioner has determined that in order to clearly reflect income, the taxpayer's inventory valued now at cost must include, in addition to the cost of raw materials and supplies entered into or consumed in connection with the product, expenditures for direct labor and indirect expenses incident to and necessary for the production of the particular article. Treas.Reg. 1.471–3(c).

■ It is well settled that each year's transactions is to be considered separately without regard to what the net effect of a particular transaction might be if viewed over a period of years. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931); Brad-

ford v. Commissioner of Internal Revenue, 233 F.2d 935, 938 (6 Cir., 1956); Reuben H. Donnelley Corp. v. United States, 257 F.Supp. 747, 758 (S.D.N.Y., 1966). Not only does plaintiff's method of accounting violate the annual accounting system, Healy v. C. I. R., 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007 (1953), but it frustrates the purpose of inventory accounting which is to correctly assign to each annual period its profits and losses. Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 268, 50 S.Ct. 263, 74 L.Ed. 848 (1930). In any event, consistency in plaintiff's method of accounting is not controlling. Fruehauf Corp. v. C. I. R., 356 F.2d 975 (6 Cir., 1966), cert. den. 385 U.S. 822, 87 S.Ct. 51, 17 L.Ed.2d 60.

To summarize, after long study we cannot conclude that the plaintiff has met its heavy burden of showing the order of the Commissioner was arbitrary and the plaintiff must therefore fail.

Entry accordingly.

Since the Court's findings of fact and conclusions of law appear in this memorandum, it is intended to serve as findings of fact and conclusions of law required by Rule 52 F.R.Civ.P.