Estate of Louise K. Adams, Deceased, Charles E. Jordon, Executor v. Commissioner.
Estate of Louise K. Adams, Deceased v. Commissioner
Docket No. 2989-64.
United States Tax Court
T.C. Memo 1967-221; 1967 Tax Ct. Memo LEXIS 39; 26 T.C.M. (CCH) 1098; T.C.M. (RIA) 67221; November 3, 1967
Hugh R. Dowling and John W. Mooers, 1824 Barnett Bank Bldg., Jacksonville, Fla., for the petitioner. Marshall H. Barkin, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in income tax for the years and in the amounts as follows: 1960
$ 5,564.81
1961
6,542.19
1962
36,660.39
The issues for determination are: (1) Whether the determination of deficiencies for the years 1960 *41 and 1961 was invalid because it resulted from an unauthorized examination of decedent's books of account within the meaning of section 7605(b) of the Internal Revenue Code of 1954. [1]
(2) Whether the amount of $1,100, which decedent received from her employer as an automobile allowance in each of the years 1961 and 1962, was includable in her gross income for those years. (3) Whether decedent was entitled, for the year 1962, to a business bad debt deduction for loans made to a corporation of which she was a stockholder. (4) Whether decedent maintained a home in 1962 which constituted her daughter's principal place of abode so as to entitle decedent to head-of-household status for that year. [2]
Inasmuch as additional issues raised by the pleadings have been disposed of by agreement of the parties, a Rule 50 computation will be necessary. General Findings of Fact Some *42 of the facts have been stipulated and are found accordingly. Louise K. Adams (hereinafter sometimes referred to as the decedent) resided in Miami, Florida, during the taxable years in question. She filed her income tax returns as an individual for the years 1960, 1961, and 1962 with the district director of internal revenue at Jacksonville, Florida. On April 28, 1966, Louise K. Adams died, and pursuant to the provisions of her will, Charles E. Jordon was designated by the County Judge's Court of Dade County, Florida, as the executor or her estate. By order, dated August 16, 1966, this Court substituted "ESTATE OF LOUISE K. ADAMS, Deceased, CHARLES E. JORDON, Executor" as petitioner in this cause in place of "LOUISE K. ADAMS." Issue 1 - Unauthorized Examination Under Section 7605(b) Findings of Fact Decedent's tax years 1960 and 1961 were examined by an internal revenue agent. As a result of such examination, deficiencies in income taxes for those years in the respective amounts of $9,269.35 and $1,158.46 were determined. Those amounts were assessed by the district director of internal revenue, Jacksonville, Florida, on August 23, 1963, and payments in the amount of the *43 deficiencies and accrued interest thereon for both years were made on August 13, 1963. [3] Subsequent to those events, the statutory notice of deficiency involved in the instant case, dated April 3, 1964, was sent to decedent. Opinion The issue presented is whether the deficiencies determined for 1960 and 1961 were the result of a second examination within the meaning of section 7605(b)[4] and if so, whether the statutory notice of deficiency was therefore invalid. The only evidence in the record bearing on this issue was presented by stipulation and disclosed that prior to the date of the statutory notice of deficiency forming the basis of this proceeding, decedent's tax years 1960 and 1961 *44 had been "examined" by a revenue agent and as a result of that examination income tax deficiencies for 1960 and 1961 were determined against decedent, assessments were made by the district director for those amounts, and in August 1963 decedent paid the deficiencies and accrued interest. On April 3, 1964, another notice of deficiency covering the years 1960 and 1961, as well as 1962, was sent to decedent. On these limited facts, petitioner contends that respondent's second notice of deficiency failed to comply with the requirements of section 7605(b) and therefore the determination of deficiencies now at issue for 1960 and 1961 is invalid. Petitioner's contention is apparently based on the belief that the stipulated facts are adequate to prove, pursuant to the language of the statute, that more than "one inspection of * * * taxpayer's books of account" was made without compliance with either the request or notice requirements of section 7605(b). Respondent, on the other hand, contends that in order to fall within the prohibition of section 7605(b), there must be a second audit of taxpayer's "books and records," and not merely an office audit of his tax return. Not only does the relevant *45 Code provision couch the prohibited second examination in terms of "taxpayer's books of account" but this Court, as well as others, have similarly held that the prohibition contemplated by section 7605(b) applies only to the books and records of the taxpayer. United States Holding Co., 44 T.C. 323, 327 (1965); Ngeurkik v. United States, 354 F. 2d 629, 631 (C.A. 7, 1965). From the limited facts presented by this record we are unable to find that the deficiencies at issue resulted from more than one inspection of petitioner's "books of account." We must therefore sustain the presumptive validity of respondent's statutory notice of deficiency. Having so determined, we need not consider whether the deficiency notice might have been invalid had respondent violated the prohibitions of section 7605(b). Issue 2 - Inclusion of Auto Allowance in Income Findings of Fact Following the death of her husband on June 2, 1959, the decedent was appointed director of public relations of the Biscayne Kennel Club, Inc. (hereinafter the Kennel Club or Club), at an annual salary of $25,000. She served in that capacity for each of the years 1961 and 1962. In addition to her *46 duties as director of public relations, decedent was primarily responsible for all publicity, advertising, community relations, and charitable matters affecting the Kennel Club and in furtherance of those responsibilities was required to attend meetings and conferences during the entire calendar year. The Kennel Club neither owned nor leased any automobiles for its own use. Prior to the years in question it adopted a policy of reimbursing certain key personnel for their automobile expenses incurred in connection with the Kennel Club's business, and during each of the years 1961 and 1962, decedent received $1,100 from the Kennel Club as an automobile allowance, for which the decedent was not required to submit any information to the Club respecting her automobile expenses or business use. In addition, the Club paid decedent a mileage allowance for the actual mileage she drove during the racing season, and for which she was required to submit a statement evidencing her use of the car for business purposes. The racing seasons of the Club for the years 1959 through 1963 were as follows: Oct. 30, 1959 through Feb. 13, 1960
90 days
Feb. 16, 1961 through June 2, 1961
90 days
June 1, 1962 through Sept. 15, 1962
26 days
Sept. 28, 1962 through Jan. 12, 1963
90 days
*47 During the years in question decedent owned only one automobile, a 1961 Chevrolet Impala which was purchased on November 12, 1960, for $4,036.35, including a trade-in allowance of $1,937.05 on her old car. Decedent incurred operational and maintenance expenses on that car during 1961 and 1962 in the respective amounts of $924.44 and $1,328.44. No deduction was claimed on decedent's tax return for any of those expenses, [5] nor did decedent claim any amount for depreciation of the car. For each of the years in question decedent had been ill and was hospitalized and bedridden for approximately 3 months. Opinion On her income tax returns for 1961 and 1962 decedent did not report as income any part of the $1,100 automobile allowance or the mileage allowance received from the Kennel Club. Respondent concedes that decedent used her automobile for business purposes in the years in question but contends that the mileage allowance received by her constituted full compensation *48 for her automobile expenses incurred in those years and therefore the $1,100 automobile allowance received in each year constituted taxable income to decedent. Petitioner, on the other hand, contends that the decedent incurred deductible automobile expenses in excess of the mileage reimbursement in amounts at least equal to $1,100 for each of the years 1961 and 1962. In order for petitioner to prevail, there must be a showing that deductible expenses incurred for the years in question were at least equal to the total amount the decedent received from the Kennel Club as automobile and mileage allowances. Since respondent does not question the amount received by the decedent as mileage allowance, the only issue before us is whether decedent had deductible automobile expenses during the years in question, at least in the amount of the annual automobile allowance, $1,100. While petitioner has presented evidence showing the initial cost of the car owned by decedent and the annual operational and maintenance expenses of that car, there has been no showing as to the other facts which we deem critical to petitioner's position. For instance, although several witnesses testified that the *49 deceased was required to attend numerous business meetings in the course of her employment, no witness testified that the decedent always or for that matter ever used her car to attend such meetings. That being the case, we must hold that the $1,100 annual allowance was income to decedent in 1961 and 1962 and was therefore improperly omitted from decedent's taxable income for those years. Issue 3 Bad Debt Deduction Findings of Fact The decedent owned one-fourth of the outstanding capital stock of El Comodoro, Inc., a Florida corporation (hereinafter the corporation) which owned and operated a hotel in Miami, Florida, known as the El Comodoro Hotel (hereinafter the hotel). The remaining 75 percent of the outstanding stock was owned in equal portions by the decedent's mother, brother, and sister. Decedent's father had the hotel constructed in 1924 and thereafter the hotel continued to be owned and operated by members of decedent's immediate family until its sale in 1962. During the intervening years numerous loans were made to the hotel corporation by members of decedent's family. Decedent's husband had managed the hotel in former years and for a number of years she, together *50 with her husband and daughters, lived at the hotel. As of June 1, 1960, the corporation had an accumulated deficit from operations of $218,572.09. For its fiscal year ended May 31, 1961, the corporation elected to be treated as a small business corporation under the provisions of Subchapter S of the 1954 Code. Pursuant to the provisions of Subchapter S, the decedent's proportionate share of the losses from operation of the corporation for the years ended May 31, 1961, and May 31, 1962, were deducted on her individual income tax returns to the extent of $5,249.67 for 1961 and $4,789.16 for 1962. The four stockholders made financial advances to the corporation commencing in 1949 and continuing until October 10, 1962, the date on which the hotel was sold. The advances, which were treated as loans by both the corporation and the stockholders, were not worthless when made and gave rise to bona fide debtor-creditor relationships between the stockholders and the corporation. As of October 10, 1962, the loans payable to shareholders on the corporation's books totaled $266,490.65, broken down as follows: Stockholder
Amount
Mrs. T. R. Knight
$102,842.10
Mrs. Louise K. Adams
111,796.73
Mr. James C. Knight
31,351.82
Mrs. Eleanor Leigh
20,500.00
$266,490.65
*51 Also, as of October 10, 1962, the corporation had accounts receivable from shareholders as follows: James C. Knight
$47,154.61
Mrs. T. R. Knight
14,121.96
On October 10, 1962, the corporation sold the hotel property, its principal asset, for $250,000. The net proceeds derived from that sale were then distributed to the shareholders in partial repayment on the outstanding loans of the corporation in the following amounts: Mrs. T. R. Knight
$ 48,134.45
Mrs. L. K. Adams
54,060.26
Mrs. E. Leigh
20,000.00
$122,194.71 After offsetting receivables against payables, James C. Knight was obligated to the corporation in the net amount of $15,802.79. By journal entry, dated October 10, 1962, the corporation transferred the $15,802.79 owed by Knight to the accounts owed by the corporation to Mrs. T. R. Knight and the decedent by reducing the latter two accounts payable by the amounts of $7,901.39 and $7,901.40, respectively. A reconciliation of the decedent's loan account on the books of the corporation on October 10, 1962, after the aforementioned transactions, is as follows: Balance on October 10, 1962
$111,796.73
Less: Cash distribution-sale proceeds
54,060.26
$57,736.47
Less: Distribution to decedent on
account owing by corporation
to James C. Knight
7,901.40
Balance
$ 49,835.07
*52 On her income tax return for the year 1962, the decedent claimed a business bad debt deduction on "Loss on Liquidation of Loans to Corporation" in the amount of $57,736.47, computed as follows: Total advances to corporation
$111,796.73
Less: Amount received in 1962 for
final settlement of all ad-
vances
54,060.26
Loss claimed
$ 57,736.47 This loss was disallowed in full by the respondent in the statutory notice of deficiency. [6]The corporation was dissolved on May 1, 1963. Opinion The issue presented is whether petitioner is entitled to a business bad debt deduction for 1962 for loans made to the corporation. Although conceding that the loans were not worthless at the time they were made and that a bona fide debtor-creditor relationship arose as the result of such loans, respondent contends that petitioner has failed to show that the debt became worthless, either partially or totally, in the year 1962, and even if it did become worthless, petitioner is not entitled to a business *53 bad debt deduction. Petitioner, assuming the worthlessness of the debt, contends that since the corporation was so intimately identified with decedent's family, she "had a business reason to see that its obligations did not go into default and to achieve this purpose she made advances from time to time over the years." Whether or not decedent's loan to the corporation became worthless in 1962 is a question of fact, requiring consideration of all relevant factors. The record discloses that the hotel was the principal asset of the corporation, that it was sold in 1962 and that after the net proceeds from its sale had been completely distributed to the corporate shareholders in partial payment of their outstanding loans, there still remained substantial amounts unpaid to those lenders, among whom was the decedent. Respondent has not suggested any reason why, by the end of 1962, the unpaid portion of decedent's loan to the corporation had not become worthless, nor do we know of any. Under the facts presented, it would apparently have been fruitless for decedent to institute legal action for the collection of the unpaid portion of her loan. The Commissioner's regulations, sec. 1.166-2(b), Income Tax Regs. *54 , provide that - Sec. 1.166-2(b) Legal action not required. Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166. We think the facts in this case require the conclusion that the unpaid portion of decedent's loan, in the stipulated amount of $44,796.44, had become totally worthless by 1962. The remaining question is whether the loss constituted a "business" or "nonbusiness" bad debt under section 166. [7] If the loss constituted a business bad debt, petitioner is entitled to a full deduction in the year 1962 whereas if it was a nonbusiness bad debt, petitioner is entitled to only a short-term capital loss. *55 Section 166(d)(2) defines a nonbusiness bad debt as a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. It is now settled that to be deductible under section 166 as a business bad debt, a debt must have been "proximately related to the taxpayer's trade or business when created or acquired." Aubrey S. Nash, 31 T.C. 569, 573 (1958). The weakness in petitioner's position stems from a failure to show that decedent incurred the losses in question in a trade or business. Petitioner does not suggest that decedent was in the business of operating the hotel in question. To do so would be fruitless since the facts reveal that decedent's relationship to the corporation was only as a stockholder and it is now well settled that a corporation and its stockholders are generally to be treated as separate entities. Whipple v. Commissioner, 373 U.S. 193, 198 (1963). Neither has petitioner suggested that decedent was engaged in the business of lending money for financing corporations, a proposition *56 which, if contended, would fail for lack of support in the record. From the foregoing, we must sustain respondent's disallowance of the claimed business bad debt deduction and hold that petitioner was entitled only to a nonbusiness bad debt deduction for the year in question. Issue 4 Head-of-Household Tax Status Findings of Fact Nancy Adams (hereinafter referred to as Nancy) is the daughter of the decedent. From Nancy's birth until she was in the sixth grade, she resided with her parents at the El Comodoro Hotel in Miami, Florida. While she was in the sixth grade, Nancy moved with her parents to a house located at 7401 Southwest 53rd Court, Miami, Florida, where a separate bedroom was maintained for her use. In the latter part of May 1959, Nancy completed her studies at the University of North Carolina (hereinafter sometimes referred to as the University) in Chapel Hill and returned to her home in Miami. She returned prior to commencement exercises due to the illness of her father, who died on June 2, 1959. After the death of Nancy's father, her mother bore the entire expense of maintaining the house on 53rd Court and later an apartment in Miami. Decedent never remarried after *57 her husband's death. Nancy left Miami in September 1959 to assume a teaching position in Richmond, Virginia. Up to that time Nancy's parents had paid all her living expenses and expenses of education. After the school year ended in June 1960, Nancy returned to Miami to live with her mother at the 53rd Court address and in September 1960 she enrolled at the University of Miami Law School. During 1961 the decedent sold the house on 53rd Court and leased a two-bedroom apartment in Miami, one bedroom of which was considered to be Nancy's. During 1962 Nancy's room in her mother's apartment contained the same bedroom furniture which had been in her room at the house on 53rd Court. The room also contained approximately one-half of Nancy's clothes, her television and stereo sets, and her books. In June 1961, Nancy returned to Chapel Hill to assume the full-time position of assistant dean of women at the University. Although that employment was originally undertaken for only one school year, Nancy remained in her employment at the University for a second year, until June 1963. While working at the University, Nancy lived in an apartment located in a University-owned building and took some *58 graduate courses toward her master's degree. Her employer permitted her to attend one class during working hours and she could, in addition, attend evening classes. For the 2 school years she worked at the University, Nancy remained a registered voter in Florida and regarded her mother's residence in Miami as her home, and had the intention of returning there when she left the University. At the end of her employment in June 1963, Nancy returned to Miami and in July of that year left Miami for a 5-month trip to Europe for the purpose of study and travel. Opinion The issue presented is whether, for the year 1962, petitioner is entitled to use the tax rates prescribed for a head of household pursuant to section 1(b) of the Code. In order to do so, the definitional requirements for head of household under section 1(b)(2) [8] must have been satisfied. Section 1(b)(2) requires, in the context of the instant case, that decedent was not married at the close of 1962, that she was not a surviving spouse, and that she maintained a household during that year which constituted the "principal place of abode" of her daughter Nancy. Respondent concedes that the first two conditions have been met, *59 leaving for our determination the question whether decedent's home constituted Nancy's principal place of abode in 1962. *60 While the record fails to disclose whether or not Nancy actually lived in her mother's home for even one day during 1962, there are other facts from which petitioner contends we may determine that decedent's home constituted Nancy's principal place of abode in that year. Specifically, the record discloses that in 1962 decedent maintained a room for Nancy in the Miami apartment which room contained furniture considered by decedent to have been Nancy's bedroom furniture, half her clothes, her television and stereo sets, as well as many of her books. The room was known as "Nancy's room," was not used by anyone in her absence, and Nancy herself considered the room to be "her room" and always had the intention of returning to live with her mother when her employment at the University was terminated. In the light of these facts, we are presented with the narrow issue of whether the head-of-household tax rates were intended to apply to a taxpayer whose daughter, though a college graduate and employed on a full-time basis away from home during the entire year in question, intended to return to her mother's home at the termination of her employment. Section 1(b)'s predecessor under the *61 1939 Code, section 12(c), became part of that Code by amendment contained in section 301(a) of the Revenue Act of 1951. The report of the House Committee on Ways and Means [9] on that amendment contained the following statements: 1. * * *
A taxpayer is considered as maintaining a household only if during the year he furnishes more than half the maintenance costs of such household. Moreover, the individual who makes it possible for the taxpayer to gain the benefits of the head-of-household status must actually live in the taxpayer's household unless he is temporarily absent, for example, attending school or for reasons of health. * * * [Emphasis supplied.] * * *
3. Reasons for adopting the head-of-household provision. It is believed that taxpayers, not having spouses but nevertheless required to maintain a household for the benefit of other individuals, are in a somewhat similar position to married couples who, because they may share their income, are treated under present law substantially as if they were two single individuals each with half of the total income of the *62 couple. The income of a head of household who must maintain a home for a child, for example, is likely to be shared with the child to the extent necessary to maintain the home, and raise and educate the child. This, it is believed, justifies the extension of some of the benefits of income splitting. The hardship appears particularly severe in the case of the individual with children to raise who, upon the death of his spouse finds himself in the position not only of being denied the spouse's aid in raising the children, but under present law also may find his tax load heavier. [Emphasis supplied.] * * *
DETAILED DISCUSSION OF THE TECHNICAL PROVISIONS OF THE BILL * * *
Section 12(c) is intended to apply only where the taxpayer and such other members of the household live together in such household during the entire taxable year (except for temporary absences due to special circumstances). The fact that a child may be at college during the college term does not prevent the home of the taxpayer from also constituting the principal place of abode of the child. However, such home will not be considered as the principal place of abode where the child establishes a separate *63 habitation and only returns for periodic visits. Similarly, such home will not be considered as constituting the principal place of abode of a dependent of the taxpayer who is supported by the taxpayer for a substantial part of the year in lodgings other than those occupied by the taxpayer even though such person may at various periods live in the household, unless the residence of the dependent in other lodgings is not permanent and is due to necessity such as illness. * * * [Emphasis supplied.] Similar statements are contained in the report of the Senate Finance Committee, S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 463-465, and in the summary of the Conference Committee, Summary of the Provisions of the Revenue Act of 1951 (H.R. 4473) as Agreed to by the Conferees, pp. 5-6. The relevant Treasury regulation bearing on the interpretation to be given the words "principal place of abode" is found in section 1.1-2(c), Income Tax Regs., and provides that - (c) Household. (1) In order for the taxpayer to be considered a head of a household by reason of any individual described in subparagraph (A) of section 1(b)(2), the household *64 must actually constitute the home of the taxpayer for his taxable year. A physical change in the location of such home will not prevent a taxpayer from qualifying as a head of a household. Such home must also constitute the principal place of abode of at least one of the persons specified in such subparagraph (A). It is not sufficient that the taxpayer maintain the household without being its occupant. The taxpayer and such other person must occupy the household for the entire taxable year of the taxpayer. However, the fact that such other person is born or dies within the taxable year will not prevent the taxpayer from qualifying as a head of household if the household constitutes the principal place of abode of such other person for the remaining or preceding part of such taxable year. The taxpayer and such other person will be considered as occupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. A nonpermanent failure to occupy the common abode by reason of illness, education, business, vacation, military service, or a custody agreement under which a child or stepchild is absent for less than six months *65 in the taxable year of the taxpayer, shall be considered temporary absence due to special circumstances. Such absence will not prevent the taxpayer from qualifying as the head of a household if (i) it is reasonable to assume that the taxpayer or such other person will return to the household, and (ii) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return. [Emphasis supplied.] It appears from the foregoing legislative history, as well as the Commissioner's regulations, that, as a general rule, in order to qualify for head-of-household status, both the taxpayer and a person enumerated in section 1(b)(2)(A) or (B) (hereinafter referred to as the qualifying dependent), must have occupied the taxpayer's home for the entire year. While conceding the general rule, petitioner appears to rely on the exception in the regulation to the effect that even if the qualifying dependent is temporarily away from the taxpayer's home during the year, the taxpayer will not lose his head-of-household status provided (1) it is reasonable to assume that the qualifying dependent will return to the household, and (2) the taxpayer continues *66 to maintain the household in anticipation of such return. Assuming, without deciding, that the above two enumerated provisions were satisfied in the instant case, we must still determine whether Nancy's absence from her mother's home in 1962 was "temporary" within the intendment of that word in the relevant regulation. The regulation, section 1.1-2(c), Income Tax Regs., provides that an absence will be considered temporary if it arises out of one of the following conditions: illness, education, business, vacation, military service, or a custody agreement. Inasmuch as Nancy's absence from her mother's Miami home in 1962 was for the principal purpose of accepting full-time employment as assistant dean of women at the University of North Carolina, her absence, to be considered temporary, must fall within the "business" exception of the foregoing regulation. While it is true that neither Congress nor the Commissioner has placed any limitation on the period during which an absence for "business" may continue to be considered temporary, we think that, consistent with the language employed in the legislative history, as well as the relevant regulations, it would *67 be an unjustified extension of the Code provision to extend the head-of-household tax advantages to a taxpayer whose qualifying dependent has not only become economically independent but has also accepted full-time employment away from home for a full year at a time. In enacting the head-of-household provision, Congress was principally concerned with extending some of the benefits of income splitting to individuals who were "required" to maintain a home for a qualifying dependent, especially a child of the taxpayer. The evidence bearing on this issue discloses that for the year in question, Nancy was not only financially capable of maintaining her own living quarters but was willing to accept employment sufficiently far from her mother's home so as to be required to do so for 2 years, from June 1961 through June 1963. In light of all the foregoing factors, we do not think that decedent's Miami home was, pursuant to section 1(b)(2)(A), Nancy's principal place of abode in 1962 and therefore petitioner is not entitled to the claimed head-of-household tax status for that year. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. This issue first arose from the amended petition filed by the executor of decedent's estate, the decedent having elected to file her 1962 income tax return as an individual.↩
3. These facts are stipulated.↩
4. SEC. 7605. TIME AND PLACE OF EXAMINATION. * * *
(b) Restrictions on Examination of Taxpayer. - No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.↩
5. Decedent deducted the amount of $117.25 in her 1961 return for "Car tags" and $132 in her 1962 return for "Auto tags and licenses." These amounts were in addition to the automobile expenses as stated above.↩
6. The parties have stipulated that if petitioner is entitled to deduct any loss for the loans made by decedent to the corporation, the amount of the loss is to be $44,796.44.↩
7. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
8. SEC. 1(b) Rates of Tax on Heads of Households. - * * *
(2) Definition of Head of Household. - For purposes of this subtitle, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year, is not a surviving spouse (as defined in section 2(b)), and either - (A) maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of - (i) a son, stepson, daughter, or stepdaughter of the taxpayer, or a descendant of a son or daughter of the taxpayer, but if such son, stepson, daughter, stepdaughter, or descendant is married at the close of the taxpayer's taxable year, only if the taxpayer is entitled to a deduction for the taxable year for such person under section 151, or (ii) any other person who is a dependent of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such person under section 151, or (B) maintains a household which constitutes for such taxable year the principal place of abode of the father or mother of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such father or mother under section 151. For purposes of this paragraph and of section 2(b)(1)(B), an individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual.↩
9. H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 362↩, 364, 434.