SPANG INDUSTRIES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 553–77.

United States Claims Court.

Aug. 14, 1984.

Norman W. Goldin, Washington, D.C., for plaintiff. Reed, Smith, Shaw & McClay, Washington, D.C., of counsel.

William A. Whitledge, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

WIESE, Judge:

Plaintiff, a corporate taxpayer, earns income from the performance of long-term contracts that is reported, for federal income tax purposes, in the year in which the contract work is completed. This accounting method—a sanctioned departure from the more usual requirement of annual accounting for receipts and expenditures—requires that all expenses properly allocable to a long-term contract be deducted from income in the same year the corresponding contract revenue is taken into income. Treas.Reg. § 1.451–3(b)(2), 26 C.F.R. § 1.451–3(b)(2) (1973).

The controversy that gives rise to this refund suit centers on plaintiff's accounting treatment of the expenses attributable to its long-term contracts during the period of their accumulation, i.e., over the contract performance period. Specifically, the question is whether these unbilled expenses may be treated as inventories subject to valuation under the so-called LIFO (last-in; first-out) method of cost determination. The Government maintains that treating the cost of work-in-process as inventories is appropriate only in connection with an accrual method of reporting. When used, as here, in connection with the completed contract method of accounting, the result is said to accelerate deductions and thereby misalign the proper pairing of income and expenses which that method requires. Plaintiff, for its part, argues that the Government's criticisms are borne of a misunderstanding of the inventory me-

chanics involved. It maintains that its bookkeeping procedures conform to generally accepted accounting methods, are not contrary to the tax code, and clearly reflect income.

After much deliberation, and mindful of a decision of the Tax Court to the contrary,[1] the court concludes that plaintiff's accounting method does not satisfy the requirements of the Treasury Department's regulation regarding the completed contract method of reporting for long-term contracts. An additional matter in controversy concerns the limitations period applicable to the Commissioner's assessment. This too is an issue we resolve in the Government's favor.

### Facts[2]

Plaintiff is a Pennsylvania corporation whose income is earned through two operating divisions, the Fort Pitt Bridge Works ("Fort Pitt") and the Magnetics Division ("Magnetics"). Fort Pitt is engaged principally in the fabrication of structural steel parts for bridges. It operates generally as a subcontractor performing in accordance with customer-furnished specifications and under contracts that typically extend beyond a year in duration. Magnetics, on the other hand, is a diversified manufacturer of electrical systems. Its business includes, among other things, the assembly of electrical control systems built to precise specifications. As in the case of Fort Pitt, Magnetics' products too are unique, customer-specific, and require more than twelve months to complete.

Plaintiff reported the results of its performance under long-term contracts under two different but generally accepted accounting methods. For financial reporting purposes, that is, in information made available, say, to shareholders or the Securities and Exchange Commission, plaintiff reported its income and expenses annually

---

1. The decision in question, *Peninsula Steel Products & Equip. Co. v. Commissioner,* 78 T.C. 1029 (1982), is discussed *infra* at n. 9.

2. The facts noted here state only those necessary to an understanding of the result. Additional findings, reflecting for the most part matters to which the parties had stipulated, are set out in the opinion appendix.

in accordance with the percentage-of-completion method. For tax purposes, on the other hand, it relied upon the completed contract method, meaning that income and expenses were not recognized periodically but only in the year in which the contract work was completed and accepted.

For purposes of tracking the costs incurred and the revenues received under its long-term contracts, plaintiff relied upon the so-called "job order" system. That system consisted of a series of primary accounts in which the flow of costs and revenue were traced through the following steps.[3]

First, all raw materials ordered for all contracts were charged to a cost-of-goods-sold account called "Materials-Purchases". Similarly, all labor and overhead costs incurred were charged to cost-of-goods-sold accounts called "Direct Labor" and "Overhead", respectively. These accounts were maintained on a FIFO (first-in; first-out) cost basis. Simultaneously, a distinct job cost sheet was maintained for each contract. The job cost sheet recorded all raw materials committed to a contract and all labor and overhead hours incurred in performance.

Second, at the end of each month, the costs accumulated on the job cost summaries were totaled and then debited to a work-in-process account called "Equity-Cost of Uncompleted Fabrication Contracts"; correspondingly, there was a credit to (i.e., removal from) the cost-of-goods-sold account called "Inventory-Increase (Decrease)".

The process as here described was repeated each month as further raw materials, labor, and overhead were incurred with respect to each contract. Then, when a contract was completed, the job cost sheet was closed and the total costs of raw materials, labor, and overhead were credited to (removed from) the work-in-process account

"Equity—Cost of Uncompleted Fabrication Contracts" and charged to the cost-of-goods-sold account called "Inventory-Increase (Decrease)". Accordingly, the year end balance in this account represented either an increase or decrease in the cost of goods sold.

On the revenue side, Fort Pitt billed the general contractor only as individual bridge parts under a contract were shipped.[4] These billings were credited to an account "Equity-Billings on Fabrication Contracts". When a contract was completed, the revenue was recovered from this interim account and was taken into income by crediting the account "Sales-Completed Contracts".

As indicated, the foregoing job accounting system gathered costs as they were incurred and recorded income only upon shipment. However, under the percentage-of-completion method of reporting, income is to be recognized as it is earned, i.e., ratably as the work is performed. To that end, then, plaintiff maintained additional income statement accounts in which it recorded the estimated profit or loss on a contract in each year. By the same token, for purposes of identifying the cost and revenue information necessary to meet the reporting requirements of the completed contract method, nothing beyond the job cost summaries was actually necessary. Indeed, through the year prior to the fiscal year ended January 1, 1970, reporting under the completed contract method was carried out by subtracting from the revenues earned on each contract completed during a taxable year all the costs incurred in the performance of the contract as reflected in the job cost summaries that were maintained over the life of the contract.

The accounting/reporting change that would eventually give rise to this lawsuit occurred in the federal income tax return for 1969 (plaintiff's fiscal year ended Janu-

---

**3.** Although the cost accounting system we describe here is that employed by Fort Pitt, the parties agree that both divisions relied on essentially the same methods of accounting for long-term contracts.

**4.** In the case of Magnetics, billings were made on the basis of job progress.

ary 31, 1970). In this return, plaintiff continued to include in income all the revenues earned on all contracts completed during the year (as shown on the job cost summaries) and, as before, deducted (*i.e.*, charged to cost of goods sold) all costs incurred in the performance of those contracts. However, in the calculations determining the cost of goods sold, plaintiff, for the first time, included a "LIFO reserve for uncompleted contracts in process"—an adjusting factor which had the effect of increasing the cost of goods sold and correspondingly, of course, reducing taxable income. Included in support of this departure from prior practice was Form 970, "Application to Use LIFO Inventory Method" requesting permission to adopt the LIFO method, in lieu of actual cost, for purposes of determining the value of unbilled contracts in process. The significance of the proposed change (as then actually demonstrated in the return's calculations) was to reduce the cost of work in process to year beginning value which, as noted, generated a cost differential, the so-called LIFO reserve, that was carried over to (and increased) the cost of goods sold.[5] Since the issue in this case centers on the concept and the mechanics of this LIFO adjustment, we include, at this point, some explanatory text.

LIFO is an assumption or convention respecting the flow of goods which holds that the first inventory sold is that most recently purchased. The assumption reverses what may once have been thought of as the more traditional notion that goods flow out in the order in which they come in. An important corollary to the LIFO assumption is the cost accounting principle which it dictates: that the cost factors associated with the acquisition and/or production of an inventory—materials, labor, and overhead—are those most recently incurred. Costs, in other words, are presumed to flow in the same "reverse" order as the inventory itself.

There are various methods of applying a LIFO system, including the method that was used here—the "dollar value" system. This system envisions inventory in terms of dollar units rather than in terms of physical units of production. Common to all LIFO methods of inventory valuation are base year inventory pools (or starting points) against which changes in subsequent year closing inventories are measured. In Spang's case, for example, the application to use a dollar value LIFO inventory method that accompanied the filing of its 1969 tax return (Form 970) indicated its purpose to apply LIFO on a single pool basis to "[t]he portion of the unbilled costs (material, labor, and overhead) of contracts in progress which were on hand in the Company's plant as of January 31, 1970."

The next step in the transition to LIFO is to convert the starting year inventory pool from end-of-year values to year beginning values. This is accomplished by means of an index that reflects, in composite form, beginning of the year price levels for materials, labor, and overhead. The value thus determined—the difference between year beginning and year ending figures for the inventory pool—is credited to a LIFO reserve account and, simultaneously, is added to the cost of goods sold. Taken together, the purpose and effect of these several steps is to accomplish the necessary realignment of costs—from closing inventory to cost of goods sold—that follows from the cost flow assumption that the last cost in is the first cost out.

The application of LIFO in subsequent years involves essentially the same computations as in the year of election. Thus, in year two, for example, the closing inventory value is first determined (again using FIFO costs) and is then converted, by means of an appropriate price-change index, to base year dollar values. Assuming that the resulting figure shows an increase over the base year LIFO value, then this incremental change is restored to a second year beginning figure (again by means of

5. In broad terms, the cost of goods sold is determined by taking beginning inventory value plus purchases less value of goods on hand, *i.e.*, closing inventory. Accordingly, a decrease in closing inventory effects a corresponding increase in the cost of goods sold.

an index). The increment, as thus adjusted to reflect the current year starting value, is added to the base year LIFO value to establish LIFO closing inventory for year two. The difference in the second year inventory between its value at FIFO and its value at LIFO defines the required LIFO reserve. That number, less the amount of the first year's reserve, is added to the LIFO reserve and, simultaneously, to the cost of goods sold. For the sake of clarification we include, as a footnote, an example illustrating the several steps which the opinion has described.[6]

Plaintiff's tax returns for the years ended January 31, 1970, 1971, and 1972 were filed with the LIFO deduction as set forth above and were not challenged by the Commissioner of Internal Revenue. However, upon subsequent audit of the years presently at issue, 1973 and 1974, the deduction of the increment to plaintiff's LIFO reserve for those years was disallowed in its entirety and restored to income. The disallowance was based upon the Commissioner's determination that because plaintiff utilized the completed contract method of accounting to report the results of long-term contracts, it could not also use an inventory method of accounting to compute its contract costs. The propriety of the LIFO reserve disallowance is the issue before the court; the question comes to us following plaintiff's payment of the additional taxes claimed due and the Commissioner's rejection of a timely demand for their refund.

*Discussion*

A.

■■■ We begin the analysis by observing that the tax code grants the Commissioner broad discretion to determine whether or not a taxpayer's methods of accounting clearly reflect income. 26 U.S.C. §§ 446(b), 471 (1970). *Commissioner v. Hansen*, 360 U.S. 446, 467, 79 S.Ct. 1270, 1281, 3 L.Ed.2d 1360 (1959). The taxpayer who challenges the Commissioner's disapproval of a method of accounting faces a heavy burden of proof; the Commissioner's action may be set aside only where it is shown to be "plainly arbitrary", *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 271, 50 S.Ct. 263, 265, 74 L.Ed. 848 (1930), or "clearly unlawful". *Lucas v. American Code Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930). Moreover, even where the taxpayer's accounting system can be said to conform to generally accepted accounting principles, the Commissioner is not required to honor that system if it is inconsistent with the requirements of regulation. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 540–44, 99 S.Ct. 773, 785–787, 58 L.Ed.2d 785 (1979). This last is the case we have here.

Plaintiff, as we have noted, uses the completed contract method to account for the results of its long-term contracts for tax purposes. That method is one of a number of different accounting methods the use of which is permitted by the Commissioner under the authority granted him by 26 U.S.C. § 446(c) (1982). The completed contract method is particularly suited to the business needs of those taxpayers engaged in long-term contracts who, because of uncertainties, cannot report clearly the economic results of their contract performance on an on-going basis. That is, adherence to

**6. Dollar Value LIFO:**

a. Year I  Closing Inventory (FIFO) ............ $330
b. Year I  Closing Inventory (LIFO) ............ 300
c. Year I  LIFO Reserve ........................ 30

d. Year II  Closing Inventory (FIFO) ............ 450
e. Assuming an annual inflation index of 10 percent, the closing inventory for Year II expressed in Year I values is determined by the formula: 450 divided by 110%. Accordingly, the Year II closing inventory at Year I values is 409.
f. LIFO increment (409 minus 300) ............. 109
g. To convert the LIFO increment to its current year starting value, a first acquisition index is applied. Assuming starting costs in Year II are two percent higher than starting costs of Year I, then the

conversion is accomplished by the formula: 109x102%. This results in a LIFO VALUE OF $111, meaning, that the first cost in Year II is $111
h. Year II Closing Inventory (LIFO) is 300 + 111    411
i. Determination of LIFO Reserve for Year II:
   Year II Closing Inventory (FIFO) ........... 450
   Year II Closing Inventory (LIFO) .......... 411
   Reserve Required .......................... 39
   Less: Reserve at end of Year I ............. 30
   Amount of reserve to be added ............. 9

j. Increase in LIFO reserve for Year II ......... 9

the usual requirement of annual reporting would not yield informative results because contract uncertainties preclude the development of reasonably dependable estimates of the percentage of gross profit earned in relation to periodic costs incurred. AICPA Statement of Position 81–1, ¶¶ 30–33, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" (July 1981).[7] For such situations, then, the regulations provide that the "[g]ross income derived from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted [and] * * * there shall be deducted from gross income for such year all expenses which are properly allocable to the contract * * *." Treas.Reg. § 1.451–3(b)(2), 26 C.F.R. § 1.451–3(b)(2) (1973). Thus, even though items of income and expense occur over the life of the contract, their recognition for tax purposes is deferred until all results are known.

This then brings us immediately to the heart of the present dispute: the Government's contention that the completed contract method of reporting for long-term contracts is inconsistent with the LIFO method of inventory valuation. The Government begins its argument by noting that, under plaintiff's system of accounting there is deducted, in the year of contract completion, the amounts shown on the job cost sheets for all contracts completed during the year *and* the amount of the LIFO reserve that was derived from the accumulated costs of long-term contracts in process. It is the added deduction of the LIFO reserve which the Government attacks. That deduction is impermissible, says the Government, because it assigns to the cost of completed work the inflation-based expense inhering in work-in-process. Thus, it not only accelerates a deduction but also violates the requirement for separate accounting that the completed contract method necessarily demands.[8]

Plaintiff answers these criticisms by saying that they reflect a misunderstanding of the LIFO reserve. Plaintiff explains: the LIFO reserve and the calculations from which it results are simply the concluding steps of the initial cost recording process. LIFO, by very definition—last-in; first-out—cannot operate on other than an end-of-year basis, for only then is it possible to identify the last cost. Thus, it is wrong to say that the LIFO reserve shifts costs, either as to the time of their recognition or as to the contract to which they are properly allocable. Correctly understood, LIFO does no more than it states, that is, to match current costs to current sales. And that, plaintiff further adds, does not offend

---

7. "Statements of Position" are prepared by the accounting standards division of the American Institute of Certified Public Accountants (AICPA). The Introductory Note to the position statement cited in the opinion text explains that such statements "present the conclusions of at least a majority of the accounting standards executive committee, which is the senior technical body of the Institute authorized to speak for the Institute in the areas of financial accounting and reporting and cost accounting."

8. The requirement for a separate accounting for each contract is a recognized attribute of the completed contract method of reporting for long-term contracts. In an early case involving plaintiff's predecessor, *Fort Pitt Bridge Works v. Commissioner,* 24 B.T.A. 626 (1931), the completed contract method was described as follows:

The accounting system employed by the petitioner is the completed-contract system. It is a modification of a strict accrual method and differs in the one respect that items of income and expense, though recorded in primary accounts when accrued or incurred, are not carried into profit and loss as earnings of the business until the contract to which they relate is completed. A separate account is kept for each contract. Any debit balance in the account represents the investment in the contract and any credit balance represents unearned income until the completion of the contract. A characteristic of this system is that income earned in one accounting period may not be accounted for until a later period. It is peculiarly adapted to a business fulfilling contracts which lap over accounting periods where the ultimate gain or loss can not be accurately determined until the completion of the contract. It may be used even though the contracts call for payment on the basis of a certain price per pound. The contracts need not run for more than a year. The Commissioner's regulations permit its use. It has been approved, for tax purposes, by the courts and by this Board. * * * [24 B.T.A. at 641.]

the governing regulation, which speaks only in terms of the costs "properly allocable to the contract" and not as to how those costs are to be valued.

The argument plaintiff makes is not without appeal. Indeed, the same rationale was endorsed in *Peninsula Steel Products & Equipment Co. v. Commissioner,* 78 T.C. 1029 (1982), a case whose outcome on the present question plaintiff strongly urges this court to follow.[9] But despite the attraction of plaintiff's argument and its enhancement by a decision on point, this court still finds itself unconvinced. While all that plaintiff has said may be true enough, it still does not meet the crux of the Government's argument.

The essential thrust of that argument is that when the costs of long-term contracts in process are deferred—as here such costs had to be—they cannot simultaneously be brought into the measurement of income earned during the period of their deferral. By the very words of the regulation, the costs attendant to a long-term contract in process may have no income-determining consequence until the year of the contract's completion.

That is not what is happening here. Under plaintiff's system of accounting for tax purposes, the costs of long-term work in process are accumulated on a FIFO basis (*i.e.,* actual cost) and, upon completion of the contract, are then retrieved from the in-process accounts and charged to cost of sales. So far, so good. Then, however, there is added to the cost of sales the LIFO value of the accumulated costs of work remaining in process. In other words, the measure of inflation inherent in the costs of current work in process (their LIFO value) is attributed to the current year's completed contracts. And therein lies the problem. Whereas the regulation demands that costs be deferred and matched with the revenue they helped produce, plaintiff's use of LIFO does neither: it permits the current costs of long-term contracts in process (for which the regulation prescribes deferral) to affect the measure of income realized under contracts other than those for which those costs were incurred. The result, in other words, is to match current costs with current sales.

The governing regulation, however, prescribes that current costs be deferred and matched with future sales. And in that framework—where the scheme is to relate cost and revenue on a contract-by-contract basis—deferral is as much a mechanism of cost determination (*i.e.,* valuation) as it is a mechanism of cost timing. It cannot be otherwise without offense to the notion of pairing the revenue from a long-term contract activity with its identified costs as accumulated over time.

Based upon these reasons, the court holds that, for federal tax purposes, plain-

9. The taxpayer in *Peninsula* was a manufacturer of pollution control devices under long- and short-term contracts. With respect to the reporting of its long-term contracts, it maintained that it used the accrual method of accounting and not the completed contract method and thus, upon that distinction, sought to avoid the Commissioner's disapproval of its use of inventories and LIFO valuation. The court found against the taxpayer on this threshold issue. It held that the taxpayer did, indeed, utilize the completed contract method in reporting the results of its long-term contracts. However, the court then went on to decide that neither the use of inventories nor their valuation under LIFO were inconsistent with the completed contract method for reporting the results of long-term contracts. As to the argument raised by the Commissioner that LIFO permitted an acceleration of deductions (the same argument made here) the Tax Court rejected this position saying:

* * * The determination of the *value* to be placed upon an inventory has no relation to the principle or theory affecting the determination of *when* income is deemed to be received and expenses deemed incurred. *American Can Co. v. Bowers, supra.* [35 F.2d 832, 835 (2d Cir.1929).] As such, the additions to the LIFO reserve account do not amount to additional deductions for inventories included in cost of goods sold, but rather, represent the difference between the valuation of ending inventories using most recent costs (FIFO) and earliest costs (LIFO). Stated another way, the additions to the LIFO reserve account represent the difference in the deduction for costs of completed contracts when the most recent costs are assigned to the completed contracts under LIFO as opposed to the assignment of the earliest costs on a FIFO basis. [78 T.C. at 1057; emphasis original.]

tiff's method of reporting long-term contract results is incompatible with, and hence contrary to, the completed contract method of accounting as prescribed in Treas.Reg. § 1.451–3(b)(2), 26 C.F.R. § 1.451–3(b)(2) (1973).

Nor can this conclusion be avoided by claiming, as plaintiff does, that, as a producer of merchandise for income, it is obliged by regulation to accumulate its costs in inventories and hence is entitled, as a matter of law, to value those inventories on a LIFO basis.

The regulation to which plaintiff refers, Treas.Reg. § 1.471–1, 26 C.F.R. § 1.471–1 (1973), titled "Need for Inventories", says in its opening words that "[i]n order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor." As the court sees it, this regulation addresses the need for inventories in the context of an annual accounting system rather than as a requirement for every accounting system. That is to say, where the results of economic activity are to be reported on a periodic basis, then the difference in cost of merchandise on hand (including work in process) at year beginning and at year end must be taken into account. Indeed, this is a rule of accounting prescribed by regulation, *see* Treas. Reg. § 1.446–1(a)(4)(i), 26 C.F.R. § 1.446–1(a)(4)(i) (1973), and it is to this end that inventories must be maintained.

Plaintiff, however, does not account for the results of its long-term contracts on a periodic (*i.e.*, annual) basis but rather on a completion of work basis. Accordingly, for plaintiff the accumulation of costs in inventory is not an accounting requirement. This is not to say that plaintiff need not properly accumulate its costs. To the contrary, it means only that cost pools (*i.e.*, inventories) are simply not germane to an accounting system which reports income on a by-contract basis rather by a periodic summing of all costs and all revenues. To say it another way, the segregation of costs that necessarily must attend the completed contract method of reporting obviates the reality of relying on inventories as a mechanism for the determination of cost of goods sold and, thus, ultimately, of taxable income.

The perception that inventories are not a working part of the completed contract method of reporting is also to be seen in Accounting Research Bulletin No. 45. There the point is made, first of all, that under the completed contract method of reporting, an excess of accumulated costs over related billings should be shown in the balance sheet as a current asset. The text then goes on to say: "It is suggested that the asset item be described as 'costs of uncompleted contracts in excess of related billings' rather than as 'inventory' or 'work in process' * * *." ARB No. 45, "Long-term Construction-type Contracts", ¶ 12 (October 1955).[10] Without reading into the bulletin more than is intended, it seems fair enough to say that even as "inventory" is not the word of choice by which to describe the unbilled costs of long-term contracts in process for balance sheet purposes, so neither would it do to so label those same costs where they appear in a profit and loss statement. For income determining purposes, the Commissioner has ruled that such costs "merely represent deferred expenditures * * *." Rev.Rul. 59–329, 1959–2 C.B. 138.

For the reasons given here, the court concludes that plaintiff is not obliged (or more accurately stated, not entitled) to treat the unbilled costs of its long-term contracts in process as inventories for federal tax purposes. The question of its right to adopt LIFO as the method of inventory valuation is therefore moot.

---

**10.** Accounting Research Bulletins (ARB) were issued by the Committee on Accounting Procedure of the American Institute of Certified Public Accountants. These bulletins, together with promulgations of successor committees (the opinions of the Accounting Principles Board and, currently, the Financial Accounting Standards Board) are recognized in the accounting profession as the most authoritative source of generally accepted accounting principles.

B.

A subsidiary question in the case concerns the amount of the LIFO reserve which the Commissioner restored to income.

In its federal income tax return for the year ended January 31, 1973, plaintiff had deducted, as the LIFO reserve for that year, the amount of $263,822. However, upon later audit, the Commissioner restored to income the entire amount of the LIFO reserve that had been associated with plaintiff's long-term contracts through that year, *i.e.*, $327,122.17. The difference, $63,300.17, represented, of course, the LIFO reserve accumulated over the three preceding years, the taxpayer's fiscal years ending January 31, 1970 through 1972, the returns for which had each been timely filed.

The issue that comes up now centers on plaintiff's contention that the Commissioner is barred from asserting an increase in tax based upon the $63,000 figure. The argument is that an assessment based on that amount, having first been asserted more than three years after the filing of the last of the tax returns involved, is therefore barred by the three-year limitations period prescribed by 26 U.S.C. § 6501 (1982). The Government, in turn, denies that there is any merit to plaintiff's contention. It maintains that inclusion in income of the $63,000 was authorized under 26 U.S.C. § 481(a) (1982). The court agrees with the Government.

Section 481 of the Internal Revenue Code of 1954 deals with adjustments in taxable income that arise from changes in methods of accounting. Paragraph (a) of this statute states the general rule applicable to such situations. It provides, in part, as follows:

§ 481. Adjustments required by changes in method of accounting

(a) General rule.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the 'year of the change')—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted * * *.

The purpose of this section is to permit adjustments in taxable income to be made in a year of accounting change when such adjustments become necessary in order to avoid either the exclusion or the duplication of taxable items solely because of the accounting change. *Grogan v. United States*, 475 F.2d 15 (5th Cir.1973); *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 726 (1982). The adjustments so authorized may embrace amounts for which an independent assessment of additional tax would be precluded on account of the statute of limitations. *Graff Chevrolet Co. v. Campbell*, 343 F.2d 568 (5th Cir.1965); *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588, 594 (1976). Further, the change in accounting method to which the statute's operation is related may be a change voluntarily initiated by the taxpayer or it may be, as it was here, one initiated by the Commissioner. *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 715 (1982).

As has been noted, the statute authorizes adjustments to income in the year of change of items occurring in years now closed that were reported under the old accounting system. *Graff Chevrolet Co., supra*, 343 F.2d at 572. However, such compensating adjustments are permitted only when necessary to correct an omission or to avoid a duplication that would otherwise occur as a result of the accounting change. *Pursell v. Commissioner*, 38 T.C. 263 (1962), *aff'd per curiam*, 315 F.2d 629 (3d Cir.1963). Absent that causal relation, the statute of limitations would bar the "reachback".

It is with this distinction in mind that plaintiff presents the argument that there was no change in accounting involved here; rather, all the Commissioner did was to

deny an improper deduction (the LIFO reserve claimed for the tax year ending January 31, 1973) and therefore no Section 481 adjustment was authorized.

The argument is wrong. The pertinent regulations provide that a "change in method of accounting * * * includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item." Treas.Reg. § 1.481-1(a)(1), 26 C.F.R. § 1.481-1(a)(1) (1973). The regulation goes on to say that the adjustments to be made shall "take into account inventories * * * and any other item determined to be necessary in order to prevent amounts from being duplicated or omitted." Treas.Reg. § 1.481-1(b), 26 C.F.R. § 1.481-1(b) (1973). Changes in inventory accounting are, therefore, within the clear embrace of Section 481 of the Internal Revenue Code.

The same conclusion is to be seen in the provisions of Treas.Reg. § 1.446-1(e)(2), 26 C.F.R. § 1.446-1(e)(2) (1973). Subparagraph (ii)(c) of this regulation identifies "[a] change in an overall plan or system of identifying or valuing items in inventory" as a change in method of accounting; similarly, "a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory is a change in method of accounting." (A "material item" is defined in subparagraph (ii)(a) of the same regulation as "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction.")

From the regulations, then, it is apparent that the LIFO reserve—its initial deduction by plaintiff and its later disallowance by the Commissioner—signified, in each instance, a change in a system of valuing items in inventory; hence, a change in method of accounting within the meaning of Section 481.

It is clear too that, in determining the amount of the disallowance, the Commissioner was correct in tracing the LIFO reserve through to the year of its inception. Were the disallowance to be limited to the amount of the LIFO reserve deducted in plaintiff's tax year ending January 31, 1973, then the amount previously deducted (the $63,000 amount) would forever escape taxation.

To explain it another way, the Commissioner's disallowance of plaintiff's use of LIFO in conjunction with the completed contract method of reporting represented a change in accounting. And since, by virtue of this change, plaintiff could no longer use LIFO valuation, the result of that denial, absent a recapture adjustment, would be to make permanent those reserve deductions claimed in earlier years which, under the logic of LIFO accounting, could only have served to postpone income. Accordingly, an adjustment restoring to income the $63,000 figure was authorized by Section 481 in order to avoid what otherwise would have become an omission from income attributable solely to the Commissioner's change in accounting.

### CONCLUSION

For the reasons stated in this opinion, plaintiff is not entitled to the refund that it seeks. We do not direct dismissal of the complaint, however, in view of plaintiff's allegation—first raised in its reply brief—that, even with all issues resolved in the Government's favor (as is now the case) plaintiff would still be entitled to a refund of at least $6,400.00 as a result of the application of Section 481(b)(1). The Government, not having had an opportunity to speak to this point, shall be allowed an additional 30 days from the date of this opinion in which to file a supplementary brief addressed to this issue. Plaintiff shall have 20 days following submission of the Government's brief in which to respond.

### APPENDIX

#### Findings of Fact

1. Spang Industries Inc. (hereinafter "plaintiff") was, during the taxable years at issue and at the time the petition was filed in this case, a Pennsylvania corporation with its principal place of business in

Butler, Pennsylvania, and it brings this action against the United States for the recovery of income taxes assessed against and collected from plaintiff. Jurisdiction is conferred upon this court by 28 U.S.C. § 1491.

2. Since 1970, plaintiff has conducted its business through two divisions, the Magnetics Division (hereinafter "Magnetics") and the Fort Pitt Bridge Division (hereinafter "Fort Pitt").

3. Prior to 1970, Magnetics and Fort Pitt were distinct business entities with different owners. Magnetics was known as Magnetics, Inc., a publicly held company incorporated in 1949. Fort Pitt was known as Fort Pitt Bridge Works, a privately held company incorporated in 1896. The stock of Fort Pitt Bridge Works was acquired in 1963 by Spang & Company, plaintiff's parent ("Spang"). Spang also had a wholly-owned subsidiary known as Wolverine Toy Company. In 1968, Spang exchanged all of its stock in Fort Pitt Bridge Works for forty percent of the stock of Magnetics, Inc., and Fort Pitt Bridge Works became a wholly-owned subsidiary of Magnetics, Inc. In 1970, Spang exchanged all of its stock in Wolverine Toy Company for additional stock of Magnetics, Inc. Accordingly, Spang became the controlling shareholder of Magnetics, Inc.; the remaining stock of Magnetics, Inc. remained publicly held. On January 31, 1970, Fort Pitt Bridge Works was merged with and into Magnetics, Inc., and the name of the surviving company was changed from Magnetics, Inc. to Spang Industries Inc. ("plaintiff"). Wolverine Toy Company remained a wholly-owned subsidiary of plaintiff. In 1983, Spang acquired the stock of plaintiff previously held by the public, and plaintiff was merged with and into Spang.

4. Plaintiff filed its income tax returns on the basis of a fiscal year ending on January 31. The years involved in this case are plaintiff's fiscal years ended January 31, 1973 and January 31, 1974.

5. For tax reporting purposes, plaintiff used the accrual method of accounting except that plaintiff used the completed contract method of accounting to report the profits and losses from its long-term contracts.

6. Plaintiff did not treat its accumulated costs in contracts as inventory prior to its fiscal year ended January 31, 1970, for either financial reporting or federal income tax purposes. In all of its published financial statements, plaintiff consistently showed its accumulated costs of contracts separate from its inventories, and plaintiff's federal income tax returns did not show its accumulated contract costs as inventory. Similarly, on its financial records, plaintiff's accumulated costs in contracts were contained in an account for each of its divisions labeled "Equity" in long-term contracts or "work-in-progress", and were not shown as inventories. The term "Equity" had been used by the prior owners of Fort Pitt and neither the name nor the accounting system was changed by plaintiff from its acquisition of Fort Pitt in 1963 until its fiscal year ended January 31, 1970. From Magnetics' inception in 1958 until the fiscal year ended January 31, 1970, Magnetics did not report its accumulated contract costs as inventory for either financial reporting or tax purposes. Even though Magnetics once changed from the use of LIFO to the FIFO method of valuing its inventories in 1963, it made no change in the manner in which it calculated its costs of its long-term contracts for either financial reporting or tax purposes.

7. Fort Pitt was, until 1982, engaged primarily in the business of manufacturing and fabricating structural steel components (hereinafter "bridge parts") for use in the construction of bridges. Fort Pitt (operating through its Electric Weld Division) also manufactured and fabricated steel components and reinforcing rods for use in the construction of buildings and highways.

8. The bridge parts were manufactured and fabricated by Fort Pitt as a subcontractor under contracts with general contractors, which contracts provided for a stated price, subject to modifications and change orders by the general contractor. Fort Pitt worked on approximately 25 contracts in

any year, and each contract typically took in excess of one year to complete. Fort Pitt manufactured and fabricated bridge parts in accordance with precise specifications provided by the Department of Transportation of the State for whom the general contractor was constructing the bridge. When fabricated, the bridge parts were unique. Upon completion by Fort Pitt, the bridge parts were shipped to the general contractor at a job site. Until shipment, title and risk of loss with respect to each bridge part was in Fort Pitt. Upon shipment of a bridge part, title and risk of loss with respect to that bridge part passed to the general contractor.

9. Fort Pitt's contracts with respect to the bridge parts were long-term contracts as defined in Section 1.451-3 of the Treasury Regulations. For many years, Fort Pitt Bridge Works reported profits and losses from these contracts under the completed contract method of accounting for federal tax purposes and under the percentage of completion method of accounting for financial reporting purposes. Reporting under those methods was continued following the merger of Fort Pitt Bridge Works into plaintiff in 1970.

10. Fort Pitt maintained raw materials of yardstock (common sizes of sheet, plate, and round steel) for use in the fabrication of bridge parts, and raw materials of yardstock (steel components and reinforcing rods) for use by the Electric Weld Division in the fabrication of buildings and highways. These raw materials were accounted for in Fort Pitt's accounting records either on a poundage or unit basis at cost in raw materials accounts. Fort Pitt also maintained work-in-process accounts for the Electric Weld Division and railing products to reflect the costs of fabricating those products for use in buildings and highways. Each of these accounts was maintained on Fort Pitt's books on a FIFO (first-in; first-out) cost basis.

11. Commencing in 1946, Fort Pitt used the LIFO cost method of inventory pricing with respect to its raw materials and work-in-process accounts described in paragraph

10. Fort Pitt maintained LIFO Reserve accounts to reflect the difference between the FIFO and LIFO cost of these accounts. There is no dispute regarding the use of LIFO with respect to these raw materials and work-in-process.

12. Fort Pitt used a "job order" system to account for the costs incurred in the manufacture and fabrication of bridge parts. Such system was consistently used for many years prior to, during, and subsequent to the years in issue, and can be described as follows:

(a) Raw materials (yardstock) ordered for all contracts were charged to a cost of goods sold account called "Materials-Purchases". Similarly, all labor and overhead costs incurred were charged to cost of goods sold accounts called "Direct Labor" and "Overhead", respectively. These accounts were maintained on a FIFO (first-in; first-out) cost basis.

(b) Simultaneously, a distinct job cost sheet was maintained for each contract. The raw materials ordered for each contract as well as the labor and overhead incurred with respect to each contract were posted to the job cost sheet. Raw materials removed from the existing yardstock inventory and used for a contract were also posted to the job cost sheet.

(c) At the end of each month, the costs of raw materials, labor, and overhead shown on all job cost sheets were totalled and the total was debited to the work-in-process account called "Equity-Cost of Uncompleted Fabrication Contracts" and credited either to the cost of goods sold account called "Inventory-Increase (Decrease)", or, in the case of existing yardstock, to the raw materials account called "Inventory-Yardstock".

(d) The process described in (a)–(c) above was repeated each month as further raw materials, labor, and overhead costs were incurred with respect to each contract.

(e) When a contract was completed, the job cost sheet was closed and the total costs of raw materials, labor, and overhead shown therein was credited (removed) from

the work-in-process account "Equity-Cost of Uncompleted Fabrication Contracts" and charged to cost of sales by debiting (increasing) the cost of goods sold account called "Inventory-Increase (Decrease)".

(f) The balance in the cost of goods sold account called "Inventory-Increase (Decrease)" at the end of each year represented either an increase (debit balance) or decrease (credit balance) of cost of goods sold.

(g) Fort Pitt billed the general contractor only as individual bridge parts under a contract were shipped. Such billings represented both a recovery of the costs of such bridge parts and the profit on the bridge parts shipped. Such billings were credited to the account "Equity-Billings on Fabrication Contracts". When a contract was completed, the revenue was credited to the account "Sales-Completed Contracts" and removed from the account "Equity-Billings on Fabrication Contracts".

(h) Fort Pitt maintained other balance sheet and income statement accounts to record the estimated profit or loss on a contract in each year under the percentage of completion method of accounting for financial reporting purposes. At the end of each year, plaintiff made adjustments to report only the revenues and cost of goods sold from completed contracts on plaintiff's tax returns. The difference between the profit or loss shown on plaintiff's books and as reported for tax purposes was shown on Schedule M of its tax return.

13. The year-end balance in each of Fort Pitt's raw materials and work-in-process accounts described in paragraph 10 above reflected the cost (FIFO) of these raw materials and work-in-process on hand in Fort Pitt's plant, title to which was in Fort Pitt. The year-end balance in the work-in-process account "Equity-Cost of Uncompleted Fabrication Contracts" described in paragraph 12(c) less the portion of the account "Equity-Billings on Fabrication Contracts" (which represented billings for costs only) reflected the cost (FIFO) of all partially fabricated bridge parts on hand in Fort Pitt's plant, title to which was in Fort Pitt.

14. Fort Pitt timely filed its tax return for its taxable year ended January 31, 1970. Attached to that return was Form 970, titled "Application to Use LIFO Inventory Method", wherein Fort Pitt applied for permission to adopt and use, commencing with its taxable year ended January 31, 1970, the LIFO cost method of inventory pricing provided in Section 472 of the Internal Revenue Code specifically with respect to "[t]he portion of the unbilled costs (material, labor, and overhead) of contracts in progress which were on hand in the Companys' plant as of January 31, 1970." The Form 970 also indicated that, up to the time of the change being requested, the inventory method in use had valued "[c]osts in contracts in progress * * * at actual cost." At the same time, in the section of the form titled "Goods subject to inventory not to be inventoried pursuant to the LIFO method", the taxpayer indicated that "[s]upplies are valued at lower of cost or market." The Form 970 further indicated that the dollar value LIFO method based upon actual cost and a single pool using an internally developed index would be used to price the costs of long-term contracts in process at LIFO value.

15. On January 31, 1970, plaintiff computed Fort Pitt's unbilled costs of contracts in progress on a LIFO cost basis. The difference between the LIFO cost so computed and the FIFO cost shown on Fort Pitt's books was recorded in a general ledger account called "Contracts-LIFO Reserve" and charged to cost of sales. The general ledger account "Contracts-LIFO Reserve" was shown as an offset to the account "Equity-Costs of Uncompleted Fabrication Contracts". Thereafter, at the end of each subsequent year, this process was repeated, except that the charge (or credit) to cost of sales and the credit (or charge) to the general ledger account "Contracts-LIFO Reserve" at the end of each year was the amount necessary to bring the balance in the latter account to the difference between the then unbilled costs of contracts in progress at FIFO cost and

LIFO cost (the "LIFO Change"). The LIFO Change was either deducted as an addition to cost of goods sold or taken into income as a reduction in cost of goods sold.

16. Prior to the year ended January 31, 1970, plaintiff's divisions had computed their income from long-term contracts for federal income tax purposes by including in income the revenues earned from each contract and deducting the accumulated costs of each contract as shown on the job sheet from revenues. However, beginning with the year ended January 31, 1970, plaintiff deducted, in addition to the accumulated costs shown on the job sheet, the amount of the LIFO reserve referenced in paragraph 15 which was computed under the percentage of completion method of accounting for book purposes and simply carried over to the tax return.

17. Fort Pitt's LIFO Reserve account for its long-term contracts and the LIFO Change for the year, the amount deducted or taken into income, at the end of each year from 1970 through 1974 were as follows:

| | 1/31/70 | 1/31/71 | 1/31/72 | 1/31/73 | 1/31/74 |
|---|---|---|---|---|---|
| LIFO Reserve | $138,378 | $231,091 | $ 57,211 | $305,309 | $589,873 |
| LIFO Change | $138,378 | $ 92,713 | $(173,880) | $248,098 | $284,564 |

18. Fort Pitt terminated its entire bridge parts business in 1980 and 1981. At that time, the remaining balance of the LIFO Reserve was recaptured (taken into income) as its final contracts were completed.

19. Magnetics is a diversified manufacturer of electrical control systems (hereinafter "Systems"), electronic components, specialty metal alloys, and electrical devices and transformers. With the exception of the Systems, Magnetics' products are manufactured to standardized specifications and sold to customers generally. There is no dispute over any item of income or expense with respect to any of the products manufactured and sold by Magnetics other than the Systems.

20. The Systems constitute electrical control panels, and are manufactured to a customer's precise specifications under separate contracts with each customer. When manufactured, each System is unique. Magnetics generally has 30–40 contracts for Systems in any year, and each contract typically takes from three months to in excess of one year to complete. Upon completion of a System by Magnetics, the System is shipped to the customer. Until shipment, title and risk of loss with respect to each System is in Magnetics. Upon shipment of a System, title and risk of loss thereto passes to the customer.

21. Magnetics' contracts with respect to the Systems are long-term contracts as defined in Section 1.451–3 of the Treasury Regulations. Since 1958, Magnetics has reported profits and losses from these contracts under the completed contract method of accounting for federal tax purposes and under the percentage of completion method of accounting for financial reporting purposes.

22. In conducting its business, Magnetics maintains accounts with respect to raw materials such as fabrication steel, wire, devices, instruments, gauges, and push buttons, and maintains work-in-process and finished goods accounts with respect to devices and transformers (the "Non-Systems Accounts"). Each of these accounts is maintained on Magnetics' books on a FIFO cost basis.

23. From 1958 through 1963, Magnetics used the LIFO cost method of inventory pricing with respect to certain of its raw materials accounts. In 1963, Magnetics applied to the Commissioner of Internal Revenue to change to the FIFO method with respect to those raw materials accounts. From 1963 through 1970, Magnetics used the FIFO cost method of inventory pricing with respect to all of its raw materials, work-in-process and finished goods accounts.

24. The manufacture of a System requires certain raw materials, such as fabrication steel, devices, instruments, gauges, push buttons, and wire, along with an assembled transformer and other parts, and

the application of labor and overhead expense.

25. Since 1958, Magnetics consistently used a "job order" system to account for the costs incurred in the manufacture of each System. Such system can be described as follows:

(a) Raw materials and finished and in-process devices and transformers are requisitioned for use in manufacturing the Systems under each contract. As labor and overhead costs are incurred, they are charged to the cost of goods sold accounts called "Direct Labor" and "Overhead", respectively. These accounts are maintained on a FIFO cost basis.

(b) Simultaneously, a distinct job cost sheet is maintained for each contract. These job cost sheets are similar to those maintained by Fort Pitt (described in paragraph 12(b)). The cost of all raw materials and in-process and finished devices and transformers requisitioned and the costs of all labor and overhead incurred with respect to each contract are posted to the job cost sheet.

(c) At the end of each month the costs of raw materials, in-process and finished devices and transformers, labor and overhead shown on all job cost sheets are totalled and the total is debited to the work-in-process account called "Work-in-Process-Systems" and credited either to the cost of goods sold account called "Systems—Cost of Sales" or to the raw materials, in-process or finished devices or transformer accounts.

(d) The process described in (a)–(c) above is repeated each month as further materials and in-process and finished devices and transformers are requisitioned, and labor and overhead expense is incurred with respect to each contract.

(e) When the System under a contract is completed and shipped to the customer, the job cost sheet is closed and the total costs shown thereon are credited to (removed from) the work-in-process account "Work-in-Process-Systems" and charged to cost of sales by debiting (increasing) the account "Systems—Cost of Sales".

(f) The balance in the account "Systems—Cost of Sales" at the end of each year represents either an increase (debit balance) or decrease (credit balance) of cost of goods sold.

(g) As Magnetics bills the customer for progress payments required under a contract, it credits the general ledger account "Contract Billings". When the System is completed and shipped to the customer, the revenue is credited to the account "Systems Sales" and removed from the account "Contract Billings".

(h) Magnetics maintains other balance sheet and income statement accounts to record the estimated profit or loss on a contract in each year under the percentage of completion method of accounting for financial reporting purposes. At the end of each year, plaintiff makes adjustments to report only the revenues and cost of sales from completed contracts on plaintiff's tax returns. The difference between the profit or loss shown on Magnetics' books and as reported for tax purposes is shown on Schedule M of Spang's tax return.

26. The year-end balance in each of Magnetics' Non-Systems Accounts described in paragraph 21 reflects the cost (FIFO) of these items on hand in Magnetics' plant, title to which is in Magnetics. The year-end balance in the work-in-process account "Work-in-Process-Systems" described in paragraph 25(c) reflects the cost (FIFO) of all partially manufactured Systems on hand in Magnetics' plant, title to which is in Magnetics.

27. Magnetics timely filed its tax return for its taxable year ended January 31, 1970. Attached to that return was Form 970, wherein Magnetics applied for permission to adopt and use, commencing with its taxable year ended January 31, 1970, the LIFO cost method of inventory pricing provided in Section 472 of the Internal Revenue Code to price "[t]he entire inventory investment including raw materials, material content of the in-process and finished

goods, if any, direct labor and manufacturing overhead * * *." Since Magnetics had, in 1963, requested permission to change from LIFO to FIFO with respect to certain of its raw materials, specific permission was requested from the Commissioner of Internal Revenue to re-adopt LIFO for those raw materials.

28. Since 1970, Magnetics has used the LIFO cost method of inventory pricing with respect to its Non-Systems Accounts described in paragraph 22 above. Magnetics maintains LIFO Reserve accounts to reflect the difference between the LIFO and FIFO cost of these accounts. There is no dispute regarding the use of LIFO with respect to the Non-Systems Accounts.

29. On January 31, 1970, plaintiff computed the cost of the "Work-in-Process-Systems" on a LIFO basis. The difference between the LIFO cost so computed and the FIFO cost shown on Magnetics' books was recorded in a general ledger account called "Inventory-Reserve for LIFO" and charged to cost of sales. The general ledger account "Inventory-Reserve for LIFO" was shown as an offset to the account "Work-in-Process-Systems". Thereafter, at the end of each subsequent year, this process was repeated, except that the charge (or credit) to cost of sales and the credit (or charge) to the general ledger account "Inventory-Reserve for LIFO" at the end of each year was the amount necessary to bring the balance in the latter account to the difference between the then "Work-in-Process-Systems" at FIFO cost and LIFO cost (the "LIFO Change"). The LIFO Change was either deducted as an addition to cost of goods sold or taken into income as a reduction in cost of goods sold.

30. As noted in paragraph 16, the LIFO Change (or LIFO reserve) represented an amount determined in accordance with the percentage-of-completion method of accounting that plaintiff used in reporting the results of its long-term contracts for financial or book purposes. However, so far as the completed contract method of reporting was concerned (this being the accounting system used for tax purposes) the LIFO Change was not integral to that system but was simply a carry-over introduced as an added item of cost.

31. Magnetics' LIFO Reserve account for its Systems contracts and the LIFO Change for the year, the amount deducted or taken into income, at the end of each year from 1970 through 1974 were as follows:

| | 1/31/70 | 1/31/71 | 1/31/72 | 1/31/73 | 1/31/74 |
|---|---|---|---|---|---|
| LIFO Reserve | $ 6,283 | $11,041 | $6,089 | $21,813 | $56,477 |
| LIFO Change | $ 6,283 | $ 4,758 | $(4,952) | $15,724 | $34,664 |

32. Plaintiff timely filed its income tax return for the year ended January 31, 1973 and paid the tax shown thereon to be due ($749,706.00); and it timely filed its income tax return for the year ended January 31, 1974 and paid the tax shown thereon to be due ($2,018,468.00).

33. In 1976, following an audit of plaintiff's tax returns filed for the years ended January 31, 1973 and January 31, 1974, the Commissioner of Internal Revenue determined that plaintiff was not permitted to use the LIFO cost method of inventory pricing with respect to its costs of uncompleted long-term contracts. Accordingly, the Commissioner disallowed the deductions claimed by plaintiff as additions to its LIFO Reserve accounts associated with its long-term contracts for the years in question, as follows:

| | 1973 LIFO Reserves | 1974 LIFO Change |
|---|---|---|
| Magnetics | $ 21,813.00 | $ 34,664.00 |
| Fort Pitt | 305,309.17 | 284,564.00 |
| TOTAL | $ 327,122.17 | $ 319,228.00 |

34. In the audit report, the Commissioner determined that plaintiff was not permitted to use the LIFO cost method of inventory pricing with respect to its costs of uncompleted long-term contracts since (a) Rev.Rul. 59-329, 1959-2 C.B. 503, provides that the accumulated costs of long-term contracts are "deferred expenditures" and not inventories; and (b) the use of LIFO results in deductions of the costs of long-term contracts before a contract is completed, contrary to Treas.Reg. § 1.451-3, regarding the completed contract method of

**54**

accounting. Based upon the revenue ruling and the cited regulation, the Commissioner concluded that unbilled contract costs are not inventory and therefore may not be subjected to the LIFO method of inventory valuation allowed by Section 472 of the Internal Revenue Code.

35. The Commissioner increased plaintiff's taxable income for the year ended January 31, 1973 by $327,122.17, the entire amount of the LIFO Reserves associated with its long-term contracts as of January 31, 1973, and increased plaintiff's taxable income for the year ended January 31, 1974 by $319,228.00, the amount of the additions to the LIFO Reserves associated with its long-term contracts for the year ended January 31, 1974. The amount deducted by plaintiff on its tax return filed for the year ended January 31, 1973, the additions to the LIFO Reserves associated with its long-term contracts for that year, were as follows:

|  | 1973 LIFO Change |
|---|---|
| Magnetics | $ 15,724.00 |
| Fort Pitt | $ 248,098.00 |
| Total | $ 263,822.00 |

36. On March 31, 1977, plaintiff executed Form 870–C (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to the years ended January 31, 1973 and 1974.

37. On April 20, 1977, the Commissioner made assessments against plaintiff for the year ended January 31, 1973 of $197,-871.46, representing $157,018.64 of tax and $40,852.82 of interest, and for the year ended January 31, 1974 of $185,494.15, representing $153,299.44 of tax and $32,264.71 of interest. Plaintiff paid these assessments in full on April 29, 1977.

38. On November 7, 1977, plaintiff filed timely claims for refund on Forms 1120X with the District Director of Internal Revenue at Pittsburgh, Pennsylvania for the recovery of the assessments for the years ended January 31, 1973 and 1974.

39. The District Director disallowed plaintiff's claims for refund in full and mailed a notice of disallowance of each claim to plaintiff on November 7, 1977.